[No. F003300. Fifth Dist. July 16, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ALAN LANCE WEBER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of parts I, III and IV.

COUNSEL

Allen R. Crown, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert D. Marshall and Michael T. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MARTIN, J.**—Defendant was charged with five counts of attempted murder of a law enforcement officer (Pen. Code, §§ 664/187)[1] and one count of assault with a deadly weapon (§ 245, subd. (a).) It was further alleged that in the commission of counts one through five defendant personally used a firearm (§ 12022.5) and in the commission of counts one, two and three (attempted murder) defendant inflicted great bodily injury (§ 12022.7). Defendant entered pleas of not guilty and not guilty by reason of insanity to all counts and allegations.

After jury trial, defendant was found guilty of three counts of attempted murder, counts one, two and three, and was found guilty of the lesser included offense of assault with a deadly weapon as to counts four and five. The jury found all allegations of personally using a firearm and inflicting great bodily injury to be true. As to count six, defendant was found guilty of the lesser included offense of exhibiting a firearm.

The jury determined the defendant was legally sane at the time the offenses were committed. After denial of defendant's motion for new trial, defendant was sentenced to state prison for the aggregate term of 20 years.

Defendant filed a timely notice of appeal.

STATEMENT OF FACTS

On December 7, 1982, at approximately 7 p.m., Evan Zinich was working at a convenience store in Fresno. Defendant drove to the front of the store in an older model white pickup truck.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

Defendant entered the store, selected a soft drink and began drinking it. Defendant then approached the checkout counter and stood in line behind four other customers. Zinich heard defendant mumble words but was unable to understand their meaning.

When the customer immediately preceding defendant completed his purchase, defendant placed his beverage on the counter and walked out toward his pickup truck. Zinich reminded defendant he had not paid for the beverage. Defendant indicated he would return. Shortly thereafter, defendant reentered the store. Defendant had a $1 bill in his left hand and had his right hand on the stock and trigger of a rifle. Defendant paid Zinich with the $1 bill and told him to keep the change. He then pointed the rifle at Zinich and said, "Mother fucker, I'm gonna kill you." Defendant then walked out of the store. Defendant got into his pickup truck and Zinich telephoned the sheriff's department.

Deputy Sheriff Crider and Sergeant Cunningham responded in separate vehicles to the store. Zinich gave Crider a description of defendant, his vehicle, and the vehicle's license plate number.

A registration check of the license number produced an address for defendant. Sergeant Cunningham went to that address to locate the pickup truck at 7:45 p.m. After passing by the residence several times, Cunningham observed the white pickup truck. Cunningham radioed for Crider and other backup units to meet him at the residence.

Cunningham was driving a fully marked sheriff's vehicle which had red and blue lights located on the roof. Deputy Crider and Reserve Deputy Stephan arrived simultaneously in separate fully marked patrol vehicles. Crider told Cunningham that defendant had very recently been arrested for an incident involving a weapon with police officers.

Cunningham walked toward the residence with Crider to indicate the location he wanted Crider and Stephan to be positioned. When Cunningham and Crider reached the hedge in front of defendant's residence, they observed defendant standing on the patio with a rifle in his right hand.

Cunningham used his flashlight to illuminate defendant, defendant drew or raised his weapon in the other hand and Cunningham shouted "Sheriff's Department, drop the gun" three times. Cunningham was 30 to 35 feet from defendant. Crider also shouted "Sheriff's Department, drop the gun." Crider saw defendant raise the rifle. Crider moved back, drew his weapon and saw a muzzle flash at defendant's waist level. Crider called out, "Oh, my God" and fell to the ground. Crider then fired two shots. Cunningham saw

a second muzzle flash and he fell to the ground. As he fired two shots, Cunningham heard approximately six additional shots fired. Shortly after Crider was shot, a marked sheriff's car parked between the house and Crider. Defendant fired shots at the sheriff's car. Then defendant ran toward his pickup truck in a zigzag fashion.

Cunningham was unable to move his left hip or leg. Cunningham called out to defendant and stated, "Give it up." Defendant replied, "Hey, buddy, you better get out of here." Cunningham said he could not do so, that he was injured. Defendant responded, "You better find a way to get out of here."

Lieutenant Donald Burk telephoned defendant at approximately 8:15 p.m. Burk explained he was from the Fresno County Sheriff's office. Burk asked if defendant knew what was happening outside. Defendant replied, "Yes, sir, I do. I just had a shootout with a couple cops." Burk informed defendant the two officers were hurt badly and that he did not want any more shooting. Defendant responded, "I understand, but I had to shoot them. Anybody that tries to remove those officers will get the same. It's been nice talking to you. Good-by."

Defendant turned to the house and said, "Turn out the light, you've got me silhouetted. There's going to be a gun fight. Arm yourself and get down on the floor." The light was then turned off shortly thereafter.

Ten minutes later Cunningham heard more shots being fired from two different types of weapons. Two officers came to Cunningham's location, dragged him across the road and placed him in a sheriff's patrol car. Crider was pulled to a sheriff's car by Deputy O'Brian and Reserve Deputy Stephan.

Tamera Gash Mills testified she had observed defendant on occasion talking to the television set while it was turned off. She thought he was "crazy" but their friends encouraged defendant's delusions in an attempt to obtain money and gifts from him. She also testified that at her home on the afternoon of December 7, defendant said, "I'm gonna have to shoot some sheriffs."

DEFENSE

Defendant testified he "probably was beginning to be unstable" during the month of October. He had become convinced that a small international clique of important people monitored everyone. These people could manip-

ulate the world through fear "and get things armed to a point that disarmament" would be impossible.

Defendant testified he believed this group monitored people through television sets and affected people by the use of electrical impulses via electrical home appliances. He began covering his television set and talking to it while it was turned off. He removed the lightbulbs from his house as he believed they were part of the surveillance equipment. He "washed down" the inside of the house by placing a hose between the walls and flushing them with water and placed the household electrical appliances in a bathtub filled with water. He began looking at the sun to decrease his susceptibility to electrical impulses. In doing so, he testified his vision was damaged.

The defendant further believed "enemy agents" had initiated chemical warfare by contaminating a water tank located near the Greyhound bus terminal in Fresno. The "amoebic life [added to the water would] create microscopic insanity" in those who drank the water. Brandy acted as an antidote by relaxing the "critters" in the body.

On the day in question, defendant drove into the convenience store parking lot to rest. He was fearful that someone might shoot at him from the roof tops as he drove across town because he knew of the conspiracy.

Defendant entered the store and obtained a soft drink. He thought someone may try to steal the rifle he left in his truck and he walked outside without paying. Defendant returned to the store holding the rifle and paid for the soda with a dollar. He did not remember threatening Zinich.

Defendant saw a police car drive by his house that evening and thought there was a prowler in the neighborhood so he placed his rifle on the porch against a three-foot wall. Defendant saw two people in front of him and he waved. They did not return the wave and this alarmed him. He saw two lights and he fired at them with the rifle. Shots were fired at defendant and he returned the fire.

Defendant thought that someone was at the house to hold him captive and experiment on him.

Defendant heard a voice call out "I'm hit." Defendant thought he responded "Someone will come and help you." He then went to his truck to look for more ammunition but was unsuccessful.

Defendant received a telephone call and was told that he had "shot some officers." He thought it was a trick to get in close again. He did not, at the

time, believe he shot law enforcement officers. He believed they were combat troops sent by the "enemy agents."

SANITY PHASE

George F. Solomon, M.D. testified, in his opinion, at the time of the shooting defendant was legally insane in that he did not appreciate or was not capable of appreciating the nature and quality of his acts nor realized the difference from right and wrong in that he believed, due to delusions, he was shooting at enemies rather than police officers. It was Solomon's opinion defendant was a typical severe paranoid schizophrenic, most of which are not dangerous.

Dr. Allan George Hedberg testified as to his opinion that "for weeks prior to the incident he was under enormous distress and giving every indication of operating as a schizophrenic individual with very strong paranoia thought patterns, to the point where they were delusional in nature." Dr. Hedberg believed these thought patterns led the defendant to be unable to appreciate the very basic nature and quality of his actions and defendant did not possess the capability of distinguishing right from wrong on December 7, 1982.

Tamera Gash Mills testified she did not hear defendant state "he wanted to shoot some sheriffs" at her home on the afternoon of the shooting. She became confused while talking to the detective and the prosecutor before testifying at the guilt phase of the trial.

Detective Sherman Lee testified that Mrs. Mills did not want to testify against defendant. Lee had asked Mills, "Did he [defendant] say he was gonna shoot some sheriffs?" Mills replied, "Yes he did, and I don't want to be around him."

Joel Fort, M.D., testified defendant was a paranoid schizophrenic. However, Fort believed defendant was legally sane at the time of the shooting based on the surrounding circumstances. It was Dr. Fort's opinion defendant did appreciate the nature and quality of his acts and was able to distinguish right from wrong.

Dr. Charles A. Davis testified he believed defendant to be legally insane at the time of the shooting and disagreed with Fort's report and understanding of mental illness.

DISCUSSION

I. WHETHER DEFENDANT'S STATEMENTS DURING INTERROGATION WERE IMPROPERLY ADMITTED INTO EVIDENCE.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

*See footnote on page 139, *ante.*

## II. Whether Defendant Was Improperly Found to Be Sane at the Time of the Offenses.

■ Defendant challenges the findings he was sane at the time of the offenses charged and contends the trial court erred in its interpretation and application of Penal Code provisions regarding his defense of insanity. The jury was instructed: "A person is legally insane when by reason of mental disease or mental defect, he was incapable of knowing or understanding the nature and quality of his act, *and* incapable of distinguishing right from wrong at the time of the commission of the offense." (Italics added.)

The jury was further instructed in the language of a special instruction requested by the prosecution as follows: "In order for legal insanity to be shown, both of the following elements must exist.

"One, that the defendant was incapable of knowing or understanding the nature and quality of his act. This element refers to the physical act itself and whether the defendant understood what he was doing.

"*And* two, that the defendant was incapable of distinguishing right from wrong at the time of the commission of the offense." (Italics added.)

Defendant challenges the appropriateness of instructing these elements in the conjunctive rather than the disjunctive. The issue is whether the use of the word "and" rather than "or" reflects an intent of the People of the State of California to reject California's version of the historic M'Naghten standard[4] of insanity and adopt instead an even more rigid and strict rule when a new statute was added to the Penal Code by the passage of Proposition 8 at the June 1982 Primary Election.

Section 25, subdivision (b) provides: "In any criminal proceeding, including any juvenile court proceeding, in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense." (Italics added.)

---

[4] "[T]o establish a defense on the ground of insanity, it must clearly be proved that at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." (*M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng.Rep. 718, 722].)

Defendant relies on the recent case of *People* v. *Horn* (1984) 158 Cal.App.3d 1014 [205 Cal.Rptr. 119][5] which held the use of the conjunctive "and" in section 25, subdivision (b), was the result of careless drafting and not a demonstration of an intent to reject the M'Naghten test. After a long and scholarly dissertation on the historical developments and effects of the various definitions of insanity used by the courts, the *Horn* majority reinstated the M'Naghten test as the California rule and concluded the defense of insanity may be established by an adequate showing that the defendant was incapable of either knowing or understanding the nature and quality of his or her act, *or* distinguishing right from wrong. " 'Insanity, under the California M'Naughton test, denotes a mental condition which renders a person incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong in relation to that act.' (*People* v. *Kelly* [1973] 10 Cal.3d [565,] 574 [111 Cal.Rptr. 171, 516 P.2d 875].)

" . . . . . . . . . . . . . . . . . . . . . . . . .

" . . . The cases have consistently placed emphasis, indeed the total emphasis, upon the cognitive ability of defendant. (See *People* v. *Drew* [1978] 22 Cal.3d [333,] 341 [149 Cal.Rptr. 275, 583 P.2d 1318].) The question was repeatedly phrased in terms of the defendant's ability to understand the wrongfulness of his conduct. (See *People* v. *Wolff* [1964] 61 Cal.2d [795] 800-801 [40 Cal.Rptr. 271, 394 P.2d 959] and cases cited therein.) Such ability was determined by reference to the M'Naghten formula: whether he could know the nature and quality of his act *or,* if he did know it, whether he could know that what he was doing was wrong. As Perkins points out, 'a man who does not know what he is doing is in no position to distinguish between right and wrong in reference to the happening which he does not understand, although he might know what he is doing without being able to distinguish between right and wrong as to such an act. Hence the statement of criminal incapacity on this basis properly uses the word "or" to connect these two, and it has been held reversible error to substitute "and".' (Perkins [on Criminal Law (2d ed. 1969)] pp. 861-862, fns. omitted.)

"While California appellate decisions always stated the test in terms of whether the accused could know the wrongfulness of his conduct, the courts have nevertheless from time to time been lax in their statement of the M'Naghten standard. It is thus not uncommon to find decisions anomalously approving language which states the M'Naghten test in terms of a lack of understanding of the nature and quality of the act *and* the inability to per-

---

[5]The Supreme Court denied the petition for hearing of the decision in *People* v. *Horn, supra,* 158 Cal.App.3d 1014, on October 4, 1984.

ceive the act to be wrongful. [Citations omitted.] Finally, in *People* v. *Richardson* (1961) 192 Cal.App.2d 166, at pp. 172-173 [13 Cal.Rptr. 321], the Court of Appeal recognized the problem and held that it was error, although not reversible, to use the conjunctive 'and' rather than the disjunctive 'or' in stating the M'Naghten standard." (*People* v. *Horn, supra,* 158 Cal.App.3d 1014, 1025-1026, italics original.)

In *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], the Supreme Court abandoned the M'Naghten rule and decreed that trial courts should apply the test developed by the American Law Institute for its Model Penal Code, known as the ALI test. (*Id.,* at p. 345.) Four years later, the people rejected the *Drew* decision by passing Proposition 8 at the June 1982 Primary Election. Among other things, that measure enacted Penal Code section 25. The *Horn* case concluded Proposition 8 was not intended to create a new test of insanity, but was only intended to abrogate the decision in *Drew* and to return to California's version of the M'Naghten right and wrong test for criminal insanity. (*Horn, supra,* at p. 1027.)

The Attorney General relies on the recent case of *People* v. *McCowan* (Cal.App.), which held the definition of insanity contained in section 25, subdivision (b) should be interpreted literally to require proof of ignorance of both the nature of the act and the wrongfulness of it. However, a hearing was granted as to that case on February 28, 1985 (Crim. 24380). The only other case squarely on point at this time is *People* v. *Skinner* (Cal.App.), which held, as a matter of statutory interpretation, a defendant could prove insanity only by proving both prongs of the test. However, a hearing was granted in *Skinner* on June 14, 1984 (Crim. 23783). Both cases are still pending before our Supreme Court. Thus, the only citable authority at this time is the *Horn* case and we conclude we are bound by it. In reaching this conclusion, we are mindful of the fact our Supreme Court denied a hearing in *Horn* while granting hearings in both *McCowan* and *Skinner.* (See also *People* v. *Bigelow* (1984) 37 Cal.3d 731, 755 [209 Cal.Rptr. 328, 691 P.2d 994].)

Furthermore, we find it quite difficult to argue that this error was not prejudicial. Not only did the prosecution argue that both prongs must be met to find the defendant legally insane, Dr. Charles A. Davis testified that the current test in the State of California required proof of both prongs of the test as did Dr. Joel Fort. In addition, the jury asked for a rereading of the definition of insanity on two separate occasions before returning a verdict of "sane." Therefore, we must reverse the judgment below as to the

sanity phase of the trial on the basis that the improper jury instructions were prejudicial to the defendant.[6]

Defendant further requests this court to find Weber was insane at the time of the offenses under the facts and evidence presented at trial "as a matter of law." This contention is without merit.

Dr. Joel Fort, after examining the defendant, concluded that defendant intermittently suffered from paranoid schizophrenia. However, Dr. Fort concluded that the defendant was sane at the time of the offenses because the defendant, in Dr. Fort's opinion, understood the nature and quality of his act and was capable of distinguishing right from wrong. Dr. Fort testified this conclusion was substantiated by defendant's "getting ahold of the gun"; repeatedly aiming and shooting it; looking for ammunition on two occasions; engaging in four coherent telephone conversations, during one of which the defendant indicated to Lt. Burk an awareness of shooting law enforcement officers; his pursuit of normal activities, such as making coffee and watching television; and his concern for the children's safety, manifested by placing them in the bathroom. The defendant told the officers immediately after the incident that he did not shoot or know anything about the shooting of officers, and defendant stated that he knew it was wrong to shoot officers. Dr. Fort testified the defendant rationally discussed his background and appeared oriented shortly after his arrest. He denied the shootings and worried about being arrested. Only at the end of the interrogation tape did Dr. Fort find anything out of the ordinary. The defendant spoke of an electronic conspiracy and electronic control but gave no explanation of the cause and effect of that conspiracy and its relationship to what happened that day.

There is substantial evidence from which the jury could properly conclude the defendant was legally sane at the time of the incident when properly instructed. We reject defendant's contention that he was insane at the time of the offenses *as a matter of law*.

III. WHETHER DEFENDANT'S MOTION FOR NEW TRIAL WAS IMPROPERLY DENIED.*

. . . . . . . . . . . . . . . . . . . . . . .

In accordance with our conclusions in part II of this opinion, the judgment

---

[6]It should be noted that the trial judge and counsel had no guidance or precedent on this issue at the time of trial in August and September 1983. The *Horn* decision was not filed and published until August 1984. Trial judges and attorneys are not required to be clairvoyant.

*See footnote on page 139, *ante*.

is reversed as to the sanity phase of the trial and affirmed in all other respects.

Hanson (P. D.), Acting P. J., and Hamlin, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 24, 1985.