[No. A022498. First Dist., Div. Two. Oct. 29, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH LEEVER, Defendant and Appellant.

[No. A028078. First Dist., Div. Two. Oct. 29, 1985.]

In re JOSEPH LEEVER on Habeas Corpus.

**[Opinion certified for partial publication.†]**

†Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for partial publication. The parts ordered published follow.

854

**COUNSEL**

John P. Ward, under appointment by the Court of Appeal, for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Eugene Kaster and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SMITH, J.**—Charged by information with the June 25, 1982, robbery of a teller at Bank of America's 420 Post Street office in San Francisco (Pen. Code, § 211)[1] defendant Joseph Leever pled not guilty and not guilty by reason of insanity, and denied allegations of two prior felony convictions (§§ 667, 667.5, subd. (b)). Leever's motion to represent himself was granted, and jury trial proceeded in three phases—guilt, sanity and priors. The jury returned a verdict of guilty on the robbery charge, found that Leever was sane at the time of the robbery and found that he had suffered the priors (as alleged pursuant to an amendment to the information allowed at trial). Leever was sentenced to the three-year middle term for robbery (§ 213) plus two consecutive terms of five years each for the two priors (§§ 667, subd. (a), 1192.7, subd. (c)), for a total consecutive term of 13 years, less credits. Imposition of sentence for two additional one-year enhancements for the priors (§ 667.5, subd. (b)) was ordered stayed (§ 654). Timely notice of appeal from the April 19, 1983, judgment was filed on May 3. Filed concurrently with Leever's opening brief on appeal was a petition for writ of habeas corpus, which we ordered considered along with the appeal.

### BACKGROUND

The following facts drawn from evidence at the guilt phase of trial are set out here as relevant to several issues raised. Further relevant facts are presented with the discussion of each issue.

---

[1]Unless otherwise indicated, all undesignated section references in this opinion are to the Penal Code.

Leever, a federal probationer at the time of the incident, placed a call to his probation officer, Eugene Bushe, on June 21, 1982, reporting that he had tried unsuccessfully the night before to take his life by ingesting Sominex tablets and some alcohol. It had only made him sick to his stomach. He said that he would complete the attempt as soon as he found a feasible way. Bushe recalled a conversation two months earlier in which Leever had spoken of suicide. Leever sounded logical and calm over the phone but "worn out." He was despondent over being unable to return to his roommates after having stolen some money from them. He had no place else to go, had no means to support himself and was feeling ashamed of his homosexuality. He felt himself a burden to society and saw suicide as the only alternative left.

After the conversation, Bushe traced a telephone number that Leever had left earlier in the day to a movie theater, went there and discovered Leever inside. Bushe called for the local police, explaining the situation. Arriving officers detained Leever and had him admitted to San Francisco General Hospital's psychiatric ward for 72 hours' treatment and evaluation as a "5150" (Welf. & Inst. Code, § 5150)—a person dangerous to himself as the result of a mental disorder. He was released at about 9:30 a.m. on June 25, despite his application for an extension of services.

At about 11:30 the same morning as his release, Leever approached a teller window at 420 Post Street and handed teller Arturo Medrano a withdrawal slip on which were written words to the effect: "I'm desperate. Give me twenties, tens and fives or I am going to shoot everyone. Help." Leever's signature was on the bottom. Leever acted as though he had a concealed weapon. To Medrano, Leever looked nervous and anxious, sickly or drugged, and wore an expression that seemed to say, "Come on. Give it to me. I don't want to do anything." He was pale, and his eyes were sunken and bloodshot, as if he had not slept in days. He appeared disguised and spoke in whispers which Medrano could not make out except for the repeated command, "Hurry up." Medrano placed money on the counter. Leever fanned the money out, took $140 in twenties, leaving a rubber-band-bound package of bait money, and walked away. Medrano pressed his alarm button and reported the incident.

About two days later, at 4 a.m. on June 27, Leever walked into a San Francisco police station, said he wanted to turn himself in and ultimately confessed to the robbery. He was placed under arrest, at which point an apparent draft of the demand note used in the robbery was found in his wallet.

Defense witness Dr. David R. Kessler, a psychiatrist, conducted examinations of Leever and reviewed various hospital, police and other records

to reach an opinion as to Leever's mental condition. He concluded that Leever's behavior at the time of the incident "was driven by psychological forces and did not represent the usual criminal motivation associated with bank robbery." Leever was depressed and suicidal at the time and "was looking for a means to carry out some suicidal behavior." "[T]he bank robbery was carried out with the intent of following through on the suicidal behavior." Dr. Kessler found that Leever suffered from a mental disorder known as depressive neurosis and from a passive-aggressive personality disorder. In his opinion, Leever was aware at the time of the incident that he was stealing money from the bank and that he was committing a criminal act. A person suffering from the mental disorders that he diagnosed in Leever would usually be able to form the intent to commit a theft. Leever may have lacked the substantial capacity to conform his conduct to the requirements of the law, but he knew right from wrong. Neither of the disorders manifest in Leever would prevent one from knowing the nature and quality of his act.

## APPEAL

### I

Three contentions relate to the following procedural facts. Public defender Michael N. Burt was Leever's appointed counsel beginning in August 1982, for the preliminary examination in municipal court, and ending on January 5, 1983, when Judge Edward Stern of the San Francisco Superior Court heard and granted Leever's motion to proceed in propria persona (hereafter *Faretta* motion [*Faretta* v. *California* (1975) 422 U.S. 806 (45 L.Ed.2d 562, 95 S.Ct. 2525)]). Simultaneously denied, with prejudice, was a previously filed motion by which Leever had sought to proceed in propria persona as to part but not all of the trial. On February 22, the first day of jury trial, Leever tendered a written motion for advisory or "standby" counsel to assist at trial. The motion was denied, first by Judge Stern and, later that day, by trial Judge Robert L. Dossee. After the jury returned its verdict of guilty in the first phase of trial, Leever moved to be relieved of his in propria persona status and to have counsel reappointed. That motion, too, was denied, after a hearing at which original appointed counsel, Mr. Burt, advised the court that several weeks preparation would be required to ready himself for trial in the case. Leever continued to represent himself throughout the remaining proceedings.

Leever raises his first contention by way of both the appeal and the petition for writ of habeas corpus. Attached to the writ petition is a five-page letter to Judge Stern dated January 25, 1983. That letter, from a certified law clerk at the Prisoner Services Division of the San Francisco Sheriff's

Office (hereafter PSD), urges, based on a report by a Dr. Nievod, that Judge Stern reconsider his prior (January 5) grant of Leever's *Faretta* motion and hold a hearing on the issue of Leever's "competency to waive counsel." ▉ Leever concedes in this court that Judge Stern correctly granted the *Faretta* motion based on the information then before the court, but he argues that the subsequently submitted letter "provided new information of sufficient weight to require further inquiry into [his] ongoing competence to waive counsel." He relies on case law holding that once a defendant comes forward with "substantial evidence" of his incompetency to stand trial, due process requires that a full competency hearing be held. (*People* v. *Stankewitz* (1982) 32 Cal.3d 80, 92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476]; *People* v. *Laudermilk* (1967) 67 Cal.2d 272, 283 [61 Cal.Rptr. 644, 431 P.2d 228], cert. den. (1968) 393 U.S. 861 [21 L.Ed.2d 128, 89 S.Ct. 139]; see § 1368.) ▉ Although the ultimate issues of competency to stand trial and competency to waive the constitutional right to counsel (i.e., whether the waiver was knowing and intelligent) are not identical (*Westbrook* v. *Arizona* (1966) 384 U.S. 150 [16 L.Ed.2d 429, 86 S.Ct. 1320]; *People* v. *Clark* (1985) 168 Cal.App.3d 91, 94-95 [213 Cal.Rptr. 837]; *People* v. *Wolozon* (1982) 138 Cal.App.3d 456, 461 [188 Cal.Rptr. 35]), the threshold standard of "substantial evidence" of incompetency appears appropriate to determine whether a hearing should be held in either instance. (See *People* v. *Teron* (1979) 23 Cal.3d 103, 114-115 & fns. 6 and 7 [151 Cal.Rptr. 633, 588 P.2d 773], disapproved on other grounds in *People* v. *Chadd* (1981) 28 Cal.3d 739, 750, fn. 7 [170 Cal.Rptr. 798, 621 P.2d 837].) Leever has suggested no different standard.

▉ We must conclude that the letter, despite its summary of Dr. Nievod's report, did not provide substantial evidence of incompetency. ▉ While the report of a single qualified professional *concluding that a defendant is incompetent* will furnish substantial evidence, even though contradicted by other reports and evidence (*People* v. *Pennington* (1967) 66 Cal.2d 508, 519 [58 Cal.Rptr. 374, 426 P.2d 942]; *People* v. *Stankewitz, supra,* 32 Cal.3d 80, 92), a report which merely contains evaluations *without specific reference to the defendant's competency* will not. (*People* v. *Laudermilk, supra,* 67 Cal.2d 272, 285; *People* v. *Jensen* (1954) 43 Cal.2d 572, 579 [275 P.2d 25].) "The expert must state with particularity that in his professional opinion the accused is . . . incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel." (*People* v. *Burney* (1981) 115 Cal.App.3d 497, 503 [171 Cal.Rptr. 329] [competency to stand trial]; *People* v. *Pennington, supra,* 66 Cal.2d at p. 519.)

▉ The PSD letter recites that Dr. Nievod found Leever to be suicidal, incapable of understanding "the nature of his illness," impaired in judg-

ment, limited in his ability to "conceptualize abstract thought," incapable of "remaining focused" on a given task and demonstrating "bizarre thinking." The letter paraphrases rather than quotes the report and gives no indication of the context in which the doctor's conclusions were made. It also gives no hint of what the doctor's opinion may have been, if any, on the ultimate question of competency. There being no copy of the actual report in the record for our review, we must conclude that the showing was inadequate to mandate a competency hearing.

The petition for writ of habeas corpus raises only this issue and so must be denied.

### II-III*

. . . . . . . . . . . . . . . . . . . . . . .

### IV

 Leever contends, and we agree, that the trial court erred in the guilt phase of trial by not instructing on its own motion, pursuant to CALJIC No. 3.36 (1981 new) or a like instruction, as to the relevance of evidence of his mental condition at the time of the offense.[4] Evidence deserving of the jury's consideration suggested that his mental condition might have prevented him from forming the larcenous intent necessary for robbery. That was, in fact, the key factual issue at trial. Thus, the principle of mental condition as affecting the existence of specific intent was closely and openly connected with the facts before the court, was necessary for the jury's understanding of the case and, therefore, required *sua sponte* instruction. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311].)

At the time of the 1982 offense in this case, the defense of diminished capacity in California had recently been eliminated through the enactment of section 28 (Stats. 1981, ch. 404, § 4, p. 1592; see also the later amendment, Stats. 1982, ch. 893, § 3, p. 3318), but that section specifically retained a defendant's right to show that a mental disease, defect or disorder prevented him from actually forming any required mental state, including

---

*See footnote, *ante,* page 853.

[4]"Evidence has been received regarding a [mental disease] [mental defect] or [mental disorder] of the defendant . . . at the time of the offense charged . . . . You may consider such evidence solely for the purpose of determining whether or not the defendant . . . actually formed the mental state which is an element of the crime charged . . . ." (CALJIC No. 3.36 (1981 new).)

intent. (*People* v. *Whitsett* (1983) 149 Cal.App.3d 213, 215-216 [196 Cal.Rptr. 647].) The Attorney General correctly notes that, while Leever complains that the jurors were not instructed as to how evidence of mental condition *could* be used, CALJIC No. 3.36 is phrased as a *limitation* on the use of such evidence, telling them (consistently with section 28) that they may "consider such evidence *solely*" for the purpose of determining the requisite mental state for the charged offense. (Italics added; see fn. 4, *ante.*) Nevertheless, the instruction does convey, albeit in language of limitation, the appropriate use of the evidence and thus would have cured the instructional deficiency. We do not mean to suggest, however, that instructing in the language of CALJIC No. 3.36 was the only or best way to convey the needed information.

A review of the entire record leaves us of the opinion that no miscarriage of justice resulted from the error and that reversal is therefore not required. (Cal. Const., art. VI, § 13.) Intent was the only disputed factual issue at trial, and the sole source of that dispute was whether Leever's depressed and suicidal state of mind prevented his forming the specific intent to permanently deprive the teller of the money. While the People's case, of course, required (and did contain) evidence on every element of robbery, the defense concentrated solely on the circumstances showing Leever's mental condition before, during and after the incident to demonstrate lack of specific intent. Then, in closing statements to the jury, both sides focused almost exclusively on that aspect of the case. Leever, acting as his own counsel, emphasized repeatedly that intent was the only issue.[5] The prosecutor in turn acknowledged, in rebuttal: "The thrust of Mr. Leever's defense is that he lacked the mental capacity to commit the crime, and the law recognizes that—that the acts of a person have to be coupled with a certain mental state before they're culpable." There can be no doubt under the circumstances that the jurors knew the legal significance of the evidence of mental condition. They were properly instructed on the required specific intent, the use of circumstantial evidence and the necessary concurrence of act and intent. Most importantly, the court's final substantive instruction informed them that the specific intent to permanently deprive the owner of his property "may be shown by the circumstances surrounding the commission of the act," that the proven circumstances must be consistent with the existence of specific intent and irreconcilable with any other rational con-

---

[5]Leever's closing comments, for example, were these: "I feel that to convict me of robbery would be an injustice, considering the circumstances of the offense, the testimony that was offered, the evidence that has been admitted for your consideration. It's just a simple issue of an unlawful act was committed [*sic*], and the other question is: Was it done willfully; was the mental intent there, the criminal intent, specific intent; was the individual who committed it, was he at the time in the right frame of mind? I submit that he was not. And I think the evidence showed that. [¶] Thank you."

clusion, and that any reasonable interpretation of the evidence pointing to the absence of specific intent must be adopted. (See CALJIC No. 2.02 (1980 rev.).)

Leever's reliance on *People* v. *Henderson* (1963) 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d 677], does not help him. There the trial court's failure to instruct *sua sponte* on principles of diminished responsibility in a conviction for first degree murder was held to be prejudicial despite, as in this case, the issue being continuously before the jury as the sole defense theory in a case where the defendant's commission of the act was undisputed. The People contended that there was no prejudice because intent and state of mind were "fully developed by argument of counsel and were adequately covered by the instructions given." (*Id.*, at p. 491.) The Supreme Court agreed that "in light of such extensive argument on the issue of defendant's responsibility he could not have been harmed" by the lack of instruction "*if the jury was otherwise properly instructed on intent.*" (Italics added; *ibid.*) However, the diminished responsibility defense was held to have been effectively removed from the jury's consideration by *improper instruction* that intent was manifested in part by the "sound mind" of the defendant and that only idiots, lunatics and insane persons unable to tell right from wrong were of *un*sound mind. (*Id.*, at pp. 491-493.) Thus, the erroneous "sound mind" instruction's removal of the diminished responsibility defense, "aggravated by the court's failure to give any instruction that told the jury for what purpose they could consider the evidence of that defense," required reversal. (*Id.*, at p. 494.) Here, by contrast, there was no erroneous instruction removing the defense from the jury's consideration. The failure to instruct on mental condition as affecting the formation of specific intent is not, alone, cause for reversal under the circumstances.

V*

. . . . . . . . . . . . . . . . . . . . . .

VI

The insanity defense in California was redefined, effective June 9, 1982, through the enactment of section 25, part of the reforms effected by the passage of voter-initiated Proposition 8 on the June 8, 1982, primary election ballot (hereafter Proposition 8).[6] The jury in this case was instructed,

---

*See footnote, *ante,* page 853.

[6]Proposition 8 applies to criminal proceedings for all offenses committed on or after its effective date. (*People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].) It therefore applies to these proceedings for Leever's June 25, 1982, offense.

consistently with the language of subdivision (b) of section 25, that Leever could be found insane only if, at the time of the offense, a mental disease or defect rendered him incapable of *both* knowing or understanding the nature and quality of his act *and* distinguishing right from wrong.[7] Leever contends that this was error—that the jury should instead have been instructed, consistently with the M'Naghten test of insanity as used in California before 1978, that he was insane if he was incapable of *either* knowing or understanding the nature and quality of his act *or* distinguishing right from wrong. To use the conjunctive formulation of section 25 rather than the disjunctive formulation of M'Naghten, he argues, violates state and federal due process, equal protection and jury trial rights, and constitutes cruel and unusual punishment.

The California Supreme Court has recently resolved this issue in *People v. Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752]. Agreeing with the Court of Appeal in *People v. Horn* (1984) 158 Cal.App.3d 1014 [205 Cal.Rptr. 119], that the initiative provision's use of the conjunction "and" rather than "or" was apparently inadvertent, the court concluded that "section 25(b) reinstated the M'Naghten test as it was applied in California prior to *Drew* [*People v. Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318]] as the test of legal insanity in criminal prosecutions in this state." (Fn. omitted, *People v. Skinner, supra,* 39 Cal.3d at p. 777.)[8] The trial court in *Skinner* had found that the defendant strangled his wife knowing that he was killing her but believing, due to a paranoic-schizophrenia-induced delusion, that he had a God-given right and duty to do so because his wife had violated, or was inclined to violate, their marriage vows. Adhering to the "and" language of section 25, the court had found him to be legally sane because, although he was unable to appreciate that his act was wrongful or criminal, he knew the nature and quality of his act. (*Id.,* at p. 770.) The Supreme Court, concluding that the trial court's factual findings were supported by the evidence (*ibid.*), reversed the judgment with directions to enter a judgment of not guilty by reason of insanity. (*Id.,* at p. 784.)[9]

---

[7]Subdivision (b) of section 25 provides: "In any criminal proceeding, including any juvenile court proceeding, in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."

[8]By so interpreting the statute, the court avoided what it called "serious questions of constitutional dimension under both the due process and cruel and unusual punishment provisions of the Constitution." (*People v. Skinner, supra,* 39 Cal.3d 765, 774.)

[9]Chief Justice Bird dissented, finding no indication that the electorate, in passing Proposition 8, intended "or" rather than "and," and finding it beyond the court's power "to ignore the expression of popular will and rewrite the statute." (*People v. Skinner, supra,* 39 Cal.3d 765, 786, dis. opn. of Bird, C. J.)

■ It follows from *Skinner* that it was error in the instant case to instruct the jury in literal accordance with the "and" language of section 25, subdivision (b). The question now is whether the error was prejudicial. (Cal. Const., art. VI, § 13.) In the analogous context of error in use of the M'Naghten standard of insanity when the less stringent ALI test should have been employed, our courts have consistently inquired whether it was reasonably probable that a finding of insanity would have been made absent the error. (*People* v. *Cruz* (1980) 26 Cal.3d 233, 251-252 [162 Cal.Rptr. 1, 605 P.2d 830]; *In re Ramon M.* (1978) 22 Cal.3d 419, 431 [149 Cal.Rptr. 387, 584 P.2d 524]; *People* v. *Drew* (1978) 22 Cal.3d 333, 352 [149 Cal.Rptr. 275, 583 P.2d 1318]; *People* v. *Schneider* (1979) 95 Cal.App.3d 671, 680 [157 Cal.Rptr. 314]; *People* v. *Wagoner* (1979) 89 Cal.App.3d 605, 613 [152 Cal.Rptr. 639].) We see no reason to depart from that standard. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

After reviewing the entire record, we are of the opinion that a finding of insanity would not have been reasonably probable had the disjunctive "or" been used in the instruction. First, had the jurors been persuaded that Leever did not know the nature and quality of his act in robbing the bank, the instruction would have been harmless as a matter of law, for "a person who is unaware of the nature and quality of his act by definition cannot know that the act is wrong. In this circumstance the 'nature and quality' prong subsumes the 'right and wrong' prong." (Fn. omitted, *People* v. *Skinner, supra,* 39 Cal.3d 765, 777-778; cf. *People* v. *Richardson* (1961) 192 Cal.App.2d 166, 172-173 [13 Cal.Rptr. 321].) Thus, the only potential harm in the instruction would be the converse situation—that is, if they found that he did not know his act was wrong but nevertheless found him sane because they believed that he knew the nature and quality of his act. It does not appear reasonably probable that the jury found that Leever failed to appreciate that his act was wrong, either legally or morally.

The evidence, viewed sympathetically to the defense, shows that Leever was depressed to the point of attempting suicide for the second time in a week and was motivated to rob the bank in order to get enough money to rent a hotel room where he could have the seclusion and privacy to take his life. His extensive history of institutionalizations left him ill prepared for life on the outside, and his release from the hospital that morning against his wishes disappointed and frustrated him, giving him reason to commit the robbery in retaliation against society or as a "cry for help." He had been diagnosed in 1980 as a "paranoid schizophrenic in remission" and, according to recent diagnosis, had a "borderline personality disorder" but exhibited no signs of psychosis. Expert testimony was unanimous that Leever appreciated the criminality of his act, although one expert reported that it was "more debatable" whether, under the American Law Institute (*Drew*)

test, he might have lacked "substantial capacity" to understand the wrongfulness of his behavior or to conform his behavior to the requirements of the law.

The evidence clearly showed that Leever had unusual motives for the robbery. It barely suggested, however, that he did not know the robbery was wrong. Without serious question, he knew the act was wrong in the sense of being illegal. That is most strongly evident from his planning (the rehearsed note), his demeanor during the robbery, and any motive he may have had to strike out at society or call attention to his plight. On the more pertinent question of his appreciation of moral, as opposed to legal, wrongfulness (see *People* v. *Skinner, supra,* 39 Cal.3d 765, 779-780), there is no more than a speculative inference that his unusual motives could have so distracted or distorted his thinking that he felt no consciousness of wrongdoing. Both of the experts to offer an opinion on the ultimate issue of sanity concluded that Leever was sane.[10]

It is highly unlikely, on this record, that the jury's finding of sanity was attributable to the erroneous instruction rather than the state of the evidence. It is thus not reasonably probable that the error affected the result. (Contrast *People* v. *Weber* (1985) 170 Cal.App.3d 139, 145, 148-149 [215 Cal.Rptr. 827] [experts agreed that paranoic delusions left the defendant incapable of distinguishing right from wrong].)

## VII

 The jury found true allegations that Leever was convicted in federal court of an August 1975 bank robbery (18 U.S.C. § 2113(a))[11] and a May

---

[10]It is of no relevance to our examination of record *evidence* that, as the *nontestimony* comments of counsel to the court indicate, clinical psychologist Dr. Abraham Nievod could have testified, contrary to the other two experts, that Leever was legally insane. That opinion was not brought out in Dr. Nievod's testimony and was not otherwise placed in evidence.

[11]"Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or [¶] Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—

"Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both." (18 U.S.C. § 2113(a).)

1977 assault with a dangerous weapon (18 U.S.C. § 113(c)).[12] Leever contends that the two five-year enhancements he received under section 667 must be stricken because neither federal felony was proved to contain all the elements necessary to constitute a "serious felony" within that section's definition, borrowed from section 1192.7, subdivision (c). (§ 667, subds. (a) and (c).)

Section 667, a recidivist statute enacted by the passage of Proposition 8, prescribes a consecutive, five-year enhancement for each separately tried prior conviction of "a serious felony in this state or . . . any offense committed in another jurisdiction which includes all of the elements of any serious felony, . . ." (§ 667, subd. (a).) The section takes its definition of "serious felony" from the list of statutory offenses and enhancements and nonstatutory offenses found in subdivision (c) of section 1192.7. (*People* v. *Jackson* (1985) 37 Cal.3d 826, 831-832 [210 Cal.Rptr. 623, 694 P.2d 736]; § 667, subd. (d).)

As with other statutory enhancements, the elements of a section 667 enhancement must be pleaded and, if contested, proved beyond a reasonable doubt. (*People* v. *Jackson, supra,* 37 Cal.3d at p. 835 & fn. 12; see *In re Yurko* (1974) 10 Cal.3d 857, 862 [112 Cal.Rptr. 513, 519 P.2d 561].) Such proof may come from certified copies of prison records, court orders or a judgment. (*People* v. *Brucker* (1983) 148 Cal.App.3d 230, 241 [195 Cal.Rptr. 808]; *People* v. *Lizarraga* (1974) 43 Cal.App.3d 815, 820 [118 Cal.Rptr. 208].) However, such proof "establishes only the minimum elements of the crime, even if the charging pleading contained additional, superfluous allegations; and . . . the prosecution cannot go behind the record of the conviction and relitigate the circumstances of the offense to prove some fact which was not an element of the crime." (*People* v. *Jackson, supra,* 37 Cal.3d at p. 834, interpreting and relying on *People* v. *Crowson* (1983) 33 Cal.3d 623, 633-634 [190 Cal.Rptr. 165, 660 P.2d 389].) In other words, that proof establishes only the *least adjudicated elements* of the prior conviction. (*Ibid.*) Nevertheless, the necessary elements of a foreign conviction must be determined in light of that jurisdiction's statutory or common law so that lack of *facial* congruence of elements between two statutes does not end the inquiry. (*People* v. *Crowson, supra,* 33 Cal.3d at pp. 630-631 [federal case law examined to determine whether conviction under the federal drug conspiracy statute (21 U.S.C. § 846) requires an "overt act"];

---

[12]"Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:

" . . . . . . . . . . . . . . . . . . . . . .

"(c) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by fine of not more than $1,000 or imprisonment for not more than five years, or both." (18 U.S.C. § 113(c).)

*People* v. *O'Bryan* (1985) 37 Cal.3d 841, 844-845 [210 Cal.Rptr. 450, 694 P.2d 135] [California case and statutory law examined to define "residence" within the meaning of § 1192.7, subd. (c)(18)]; *People* v. *Enriquez* (1984) 159 Cal.App.3d 1, 4 [205 Cal.Rptr. 238].)

On the other hand, proof is not required where the defendant admits a properly pleaded enhancement pursuant to a plea bargain, after the required advisement and waiver of constitutional rights (*In re Foss* (1974) 10 Cal.3d 910, 930 [112 Cal.Rptr. 649, 519 P.2d 1073]; *In re Yurko, supra,* 10 Cal.3d 857, 863; *People* v. *Lizarraga, supra,* 43 Cal.App.3d 815, 817-818), for in that situation, where a bargain is struck, the defendant's admission is not limited to the scope of the *fact* of the conviction, but extends to all allegations concerning the prior, even though the People might have been unable to prove those allegations. (*People* v. *Jackson, supra,* 37 Cal.3d 826, 835-837; see also *People* v. *O'Bryan, supra,* 37 Cal.3d at pp. 843-844.)

Leever's prior federal "bank robbery" conviction was determined by the trial court to constitute the California serious felony of robbery (§§ 211, 1192.7, subd. (c)(19)) based on a certified copy of the federal court judgment showing his conviction for violating title 18, section 2113(a), of the United States Code (hereafter § 2113(a)). That proof was deficient.

As noted in *People* v. *Plies* (1981) 121 Cal.App.3d 676 [177 Cal.Rptr. 4] (disapproved in *People* v. *Crowson, supra,* 33 Cal.3d 623, 632, fn. 10, on a point not relevant here), section 2113(a) describes two classes of offenses. Its first paragraph makes it a felony to take or attempt to take property from another by force, fear or intimidation, in certain financial institutions; its second paragraph makes it a felony to enter or attempt to enter such institutions with the intent to commit a felony or larceny therein. (See fn. 11, *ante.*) Thus, proof that a defendant has been convicted for a violation of section 2113(a) (entitled "Bank Robbery and Incidental Crimes") does not establish which type of offense was committed. (*Id.,* at pp. 679-680.) Further, it cannot be said that a conviction for either type of offense would necessarily constitute a serious felony. First, the burglary-type offenses described in the second paragraph, while arguably establishing felony burglary in this state (§§ 459-461; see *People* v. *Plies, supra,* 121 Cal.App.3d at p. 679), do not establish the applicable *serious felony,* "burglary of a residence" (§ 1192.7, subd. (c)(18)). Second, there is a split of authority in the federal courts as to whether the robbery offense described in the first paragraph of section 2113(a) requires proof of a specific intent to permanently deprive the victim of the property taken—an essential element of robbery under California law. (§ 211; *People* v. *Plies, supra,* 121 Cal.App.3d at p. 680; see *People* v. *Ford* (1964) 60 Cal.2d 772, 793 [36

Cal.Rptr. 620, 388 P.2d 892], cert. den., 377 U.S. 940 [12 L.Ed.2d 303, 84 S.Ct. 1342].) The court in *Plies* examined that split of authority and concluded for itself that section 2113(a) defines robbery as a *general* intent crime. More recent authority rejects the *Plies* analysis and finds that *specific* intent is required. (*People* v. *Miramon* (1983) 140 Cal.App.3d 118, 126-134 [189 Cal.Rptr. 432]; see also, in the context of a statutory double jeopardy claim, *People* v. *Candelaria* (1956) 139 Cal.App.2d 432, 440 [294 P.2d 120].)

We find it unnecessary to add our view to the *Plies-Miramon* conflict. The pertinent question is whether specific intent was considered a necessary element in the particular court where Leever was convicted. His conviction occurred in a federal district court within the jurisdiction of the Ninth Circuit Court of Appeals, which has stated without equivocation: "In the Ninth Circuit, 18 U.S.C. § 2113(a) is a general intent and not a specific intent crime. [Citations.]" (*United States* v. *Smith* (9th Cir. 1981) 638 F.2d 131, 132 [holding that the exclusion of diminished capacity evidence was therefore correct].) It follows that specific intent was not necessarily an adjudicated element in Leever's prior conviction, regardless of contrary authority in other federal circuits. (Accord *People* v. *Enriquez, supra,* 159 Cal.App.3d 1, 4-5; contrast *People* v. *Crowson, supra,* 33 Cal.3d 623, 631-632 [law of the federal circuit in which the conviction occurred was unclear].) The serious-felony enhancement based on the prior section 2113(a) conviction cannot stand.

 The other serious-felony enhancement similarly cannot stand. The underlying conviction, for felony assault with a dangerous weapon (18 U.S.C. § 113(c); see fn. 12, *ante*), was deemed a serious felony under subdivision (c)(23) of section 1192.7, which lists "any felony in which the defendant personally used a dangerous or deadly weapon." Assuming the necessary congruence in both statutes' requirement that a "dangerous" weapon be used (see related discussion, *post,* in part VIII), the crucial question is whether the *personal-use* element of subdivision (c)(23) was necessarily adjudicated in the federal conviction.

Leever argues, and we must agree, that a defendant convicted of assault with a dangerous weapon, *as an aider and abettor,* need not necessarily have personally used the assault weapon. Federal law punishes as a principal anyone who "aids, abets, counsels, commands, induces or procures" the commission of a federal offense. (18 U.S.C. § 2(a).) Thus, an aider and abettor need not perform the substantive offense of which he is convicted. (*United States* v. *Campbell* (D.C. Cir. 1983) 702 F.2d 262, 265.) It has recently been acknowledged that the personal-use requirement of subdivision (c)(23) means that the enhancement will not apply in the case of a

defendant whose liability for the prior offense was "premised on his status as an aider and abettor." (*People* v. *Arwood* (1985) 165 Cal.App.3d 167, 173 [211 Cal.Rptr. 307].) Thus, because personal use is not a necessary element of the federal offense and because the copy of the judgment for the prior does not reflect whether or not Leever's liability was premised on his status as an aider and abettor, we cannot say that the element of personal use was necessarily adjudicated.

The Attorney General, noting that in the usual case proof negating the possibility of vicarious liability will be unavailable to the prosecution while vicarious liability will assertedly be a fact peculiarly within the defendant's knowledge, urges application of the so-called "rule of necessity and convenience" to place the initial burden of producing evidence of that fact on the defendant. The rule is traditionally applied in cases where the existence of a license, permit or other authorization is an exonerating fact, the existence of which would be relatively difficult or inconvenient for the prosecution to prove. (See, e.g., *In re Andre R.* (1984) 158 Cal.App.3d 336, 342 [204 Cal.Rptr. 723], and cases summarized.) An important limitation, however, is that the burden of producing the evidence may be shifted only where the defendant "has more ready access to that proof and subjecting him to this burden will not be unduly harsh or unfair." (*People* v. *Montalvo* (1971) 4 Cal.3d 328, 334 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518].) Thus the Supreme Court in *Montalvo*, in examining a statute which made criminal the commission of certain acts by a "person of the age of 21 years or over," reasoned that a defendant's precise age was known to him, not personally, but only through family sources or public or church records, and that a prosecutor would ordinarily be able to secure documentary evidence of age. Application of the rule of necessity and convenience was therefore not warranted: "The defendant may not necessarily have any substantially greater ability to establish his age than does the prosecution." (*Id.*, at pp. 334-335.)

A parallel situation is presented here. The problem of proof is that the judgment of the federal court does not contain enough information to determine whether liability was premised on Leever's status as an accomplice rather than as a direct perpetrator. The record does not show whether there are further, extant federal court records of the conviction, which is now eight years old. Nevertheless, the Attorney General does not suggest how Leever, or any other defendant, would have any greater access to such records than the prosecution. What the Attorney General seems to suggest, rather, is that Leever should have an independent recollection of the theory upon which he was tried—that is, that he can give testimony where there is no other evidence. However, as the court in *Montalvo* noted on the proof-of-majority issue, "in those rare cases where there is no evidence of the

defendant's precise age except his own belief as to what it is, the defendant might be as hard pressed as the prosecution to verify it." (*Id.,* at p. 335.) The court found that such unverified personal belief did not give the defendant "any substantially greater ability" to establish age than the prosecution. (*Id.,* at p. 334.) Here, there is even greater reason to reject the rule of necessity and convenience. It will be common—not rare—that the only evidence is the defendant's recollection. Moreover, it could be unduly harsh or unfair to require the defendant to obtain further proof when that proof is simply unavailable. We accordingly reject the rule of necessity and convenience as a reason to relieve the prosecution, in this context, of its burden of producing evidence on the critical element of personal use. (See *Mullaney* v. *Wilbur* (1975) 421 U.S. 684, 701 [44 L.Ed.2d 508, 520, 95 S.Ct. 1881].)

Nor does the holding in *People* v. *Sumstine* (1984) 36 Cal.3d 909 [206 Cal.Rptr. 707, 687 P.2d 904], convince us that a defendant in Leever's position must *affirmatively allege* in the trial court that he was convicted on an accomplice theory, as the Attorney General suggests. *Sumstine* holds that a defendant bringing a motion in the trial court to strike an alleged prior on grounds of noncompliance with *Boykin/Tahl* procedures (*Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], cert. den. (1970) 398 U.S. 911 [26 L.Ed.2d 72, 90 S.Ct. 1708]) cannot rely solely on a silent record but must affirmatively allege that his *Boykin/Tahl* rights were violated before a full evidentiary hearing must be granted. (*People* v. *Sumstine, supra,* 36 Cal.3d at pp. 922-923.) *Sumstine* rests on the traditional burden of a defendant to affirmatively rebut the presumption of regularity accorded to a judgment being collaterally attacked on constitutional grounds. (*Id.,* at pp. 924-925, conc. opn. of Lucas, J.; *People* v. *Coffey* (1967) 67 Cal.2d 204, 217 [60 Cal.Rptr. 457, 430 P.2d 15].) We are aware of no similar burden on a defendant who, like Leever, does not challenge the constitutional validity of the alleged prior but only disputes that its least adjudicated elements are fully congruent with the elements of the enhancement statute.

Next, the Attorney General contends that failure to prove the necessary congruence of elements was immaterial in this case because Leever "admitted" the alleged priors at trial.[13] We disagree. Leever's statements that

---

[13]Near the close of the guilt phase of trial, the prosecutor suggested, in response to comments by Leever the day before, a negotiated disposition that would have included the striking of one prior. The trial court, however, declined to entertain the idea that late in the proceedings.

Later, in his opening statement to the jury at trial on the alleged priors, Leever evidently "admitted" or "offered to . . . admit" his "guilt." Then, in lieu of presenting any defense evidence, he stated, "The defense has pleaded guilty, Your Honor." Finally, for his closing statement, he told the jury: "You will find, upon examining those [federal court] documents, many discrepancies as to what the prosecutor said and what the documents say. [¶] Again, I reiterate there is no contest. They were committed. It's just that there is an issue of law rather than fact, and that is not in your province."

he "admitted" or pled "guilty" to the priors were not made as part of a plea bargain and with the attendant advisement and waiver of constitutional rights. (See *People* v. *Jackson, supra,* 37 Cal.3d 826, 835-837.) He thus admitted only the fact of the convictions, not that they constituted adjudications of every element necessary for enhancement.

 To summarize, the deficiencies in proof that the prior convictions were for "serious felonies" (§ 667) are that the bank robbery conviction (assuming arguendo that the conviction was not for one of the "incidental crimes" described in 18 U.S.C. § 2113(a)) did not necessarily involve adjudication of *specific intent* (§ 1192.7, subd. (c)(19)), and the assault with a dangerous weapon conviction did not necessarily involve adjudication of *personal use* of the weapon (*id.,* subd. (c)(23)). Leever contends that the enhancements must be stricken; the Attorney General asks for a remand to allow the People to demonstrate that Leever's "prior conduct fit within the elements" of the charged serious felony definitions.

In *People* v. *Crowson, supra,* 33 Cal.3d 623, a case concerning the validity of a prior-felony enhancement under section 667.5, the court adhered to the least-adjudicated-elements principle, as applied by that court 15 years earlier (*In re Finley* (1968) 68 Cal.2d 389, 392-393 [66 Cal.Rptr. 733, 438 P.2d 381], opn. by Traynor, C. J.), and disapproved intervening Court of Appeal cases suggesting "that in some circumstances it is permissible for a court to go beyond the elements of the foreign crime in order to determine whether the defendant's *conduct in the prior incident* would have subjected him to a felony conviction in California. (See, e.g., *People* v. *Roberson* (1978) 81 Cal.App.3d 890, 894-895 . . .; *People* v. *Plies [supra]* 121 Cal.App.3d 676, 678-682 . . .; *People* v. *Cheri* (1981) 127 Cal.App.3d 280, 283-285 . . . .)" (*People* v. *Crowson, supra,* 33 Cal.3d 623, 632.) Subsequently, in *People* v. *Jackson, supra,* 37 Cal.3d 826, a case concerning the validity of a serious-felony enhancement under sections 667 and 1192.7, the court found the *Finley-Crowson* analysis inapplicable because of the defendant's admission of the prior pursuant to a plea bargain (*id.,* at pp. 834-835) but clearly indicated that that analysis would otherwise have been applicable.[14]

The Attorney General argues that *Crowson* has been undermined and the cases disapproved therein resurrected by Proposition 8's addition of subsections (d) and (f) to article I, section 28, of the California Constitution (hereafter sections 28(d) and 28(f)). We reject the argument.

---

[14]"*Crowson* established two propositions *relevant to the present case:* . . . (2) that the prosecution cannot go behind the record of the conviction and relitigate the circumstances of the offense to prove some fact which was not an element of the crime." (*People* v. *Jackson, supra,* 37 Cal.3d 826, 834, italics added.)

Section 28(f) provides in pertinent part that "[a]ny prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding." The Attorney General reads the words "without limitation" as calling for unlimited allowance of "extrinsic evidence" to prove priors. However, those words unambiguously describe how priors are to be "used," not how they are to be proved. This construction is implicitly confirmed by *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111], where the court recently held, after determining that only prior convictions involving "moral turpitude" can be used for *impeachment* under section 28(f): "[A]s in the *Finley-Crowson* line of cases, a witness' prior conviction should only be admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude." (*Id.*, at p. 317.)

As for section 28(d), the Truth-in-Evidence provision, it provides, in the part invoked here, that "*relevant evidence shall not be excluded* in any criminal proceeding, including pretrial and post conviction motions and hearings, . . ." (Italics added.) The Attorney General, however, provides absolutely no argument as to whether the section was intended to operate in the way urged here. (See discussion of the ballot pamphlet and other materials in *In re Lance W.* (1985) 37 Cal.3d 873, 888-890 & fns. 9-11 [210 Cal.Rptr. 631, 694 P.2d 744].) Nevertheless, even viewing the *Crowson* limitation on proof of priors as the "exclusion" of evidence (a point not briefed) and that, as the Attorney General argues, extrinsic evidence would be "relevant" to show that Leever's prior deeds "fit the elements of one of the serious California felonies described in section 1192.7," the *Crowson* principle is bound up in potential constitutional issues which have not been briefed at all. Holding in *Jackson* that the People could not go behind the record "to prove a fact [the residential nature of a burglary] which was not then an element of the crime," our Supreme Court cautioned: "A contrary holding, permitting the People to litigate the circumstances of a crime committed years in the past, would raise serious problems akin to double jeopardy and denial of speedy trial." (*People* v. *Jackson, supra,* 37 Cal.3d 826, 836.) This last point alone raises complex questions of state and federal constitutional law and the supremacy of the latter (see *People* v. *Castro, supra,* 38 Cal.3d 301, 313). We decline to implicitly undermine *Finley, Crowson, Jackson* and *Castro,* all binding decisions of our state's high court (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), on this inadequate state of briefing. The enhancements must be stricken.[15]

---

[15]Both serious-felony (§ 667) enhancements being invalid, there is no occasion to discuss Leever's further argument that the trial court had discretion to strike them (§ 1385; *People*

## VIII

The federal bank robbery and assault priors were also used to support one-year enhancements (whose imposition was ordered stayed pursuant to § 654) under section 667.5, subdivision (b), as felonies for which a prison term was imposed. Leever contends that these enhancements were invalid because neither prior conviction constituted a California felony.

■ As previously discussed (part VII, *ante*), the bank robbery conviction did not necessarily involve adjudication of specific intent as required by this state's definition of robbery (§ 211), and there is no assurance, based on the federal court records presented at trial, that the conviction was not based on the robbery offense, rather than the "incidental" burglary-related offenses, described in section 2113(a). The Attorney General concedes this deficiency in proof. The one-year enhancement for felony burglary therefore cannot stand, and remand to go behind the judgment is not permitted.[16] (See part VII, *ante*.)

■ Leever contends that his federal assault conviction does not contain all the elements required for felony assault in this state, and hence for enhancement under section 667.5. The disputed element is the degree of force required. We find no substantial difference between federal and state law on this point.

The federal statute (18 U.S.C. § 113(c); see fn. 12, *ante*) requires assault with a "dangerous weapon" and requires in addition a specific "intent to commit great bodily harm." The intent element is irrelevant to the question of congruence because the parallel California statute, Penal Code section 245, subdivision (a)(1) (formerly subd. (a)), defining felonious assault, requires only a general intent. (*People* v. *Wingo* (1975) 14 Cal.3d 169, 177 [121 Cal.Rptr. 97, 534 P.2d 1001].) There is no disagreement in the federal courts as to what "dangerous weapon" connotes. "The determination whether an object constitutes a 'dangerous weapon' turns not on the object's latent capability alone, but also on the manner in which the object was used.

---

v. *Whigam* (1984) 158 Cal.App.3d 1161, 1169 [205 Cal.Rptr. 227]; *People* v. *Lopez* (1983) 147 Cal.App.3d 162, 165 [195 Cal.Rptr. 27]) but failed to exercise that discretion, erroneously believing that it had none.

[16]This disposition makes it unnecessary to decide whether Leever's juvenile commitment under the Federal Youth Corrections Act (see former 18 U.S.C. § 5006(d)), upon his plea of guilty to the bank robbery charge, constituted service of a "prison term" for purposes of enhancement under section 667.5. (See *People* v. *Redmond* (1981) 125 Cal.App.3d 317, 322-323 [178 Cal.Rptr. 49], disapproved on another point in *People* v. *Superior Court (Mendella)* (1983) 33 Cal.3d 754, 760, fn. 5 [191 Cal.Rptr. 1, 661 P.2d 1081]; see also *People* v. *West* (1984) 154 Cal.App.3d 100, 106-110 [201 Cal.Rptr. 63] [prior juvenile adjudications are not "felony convictions" for purposes of section 667, notwithstanding section 28(f)].)

Objects that are not dangerous weapons *per se* are deemed to be 'dangerous weapons' within the meaning of 18 U.S.C. § 113(c) when used in a manner likely to endanger life or inflict great bodily harm. [Citation.] Thus, the term 'dangerous weapon' is not restricted to such obviously dangerous weapons as guns, knives, and the like, but can include virtually any object given appropriate circumstances." (*United States* v. *Guilbert* (11th Cir. 1982) 692 F.2d 1340, 1343, cert. den. (1983) 460 U.S. 1016 [75 L.Ed.2d 487, 103 S.Ct. 1260].) Relevant factors "include the circumstances under which the object is used and the size and condition of the assaulting and assaulted persons. A dangerous weapon is an object capable of doing serious damage to the victim . . . ." (*United States* v. *Bey* (5th Cir. 1982) 667 F.2d 7, 11; *United States* v. *Johnson* (4th Cir. 1963) 324 F.2d 264, 266, and cases cited.)

The California statute, section 245, requires, in subdivision (a)(1) (formerly subd. (a)), as it did at the time of Leever's prior assault offense, that the assault be with a "deadly weapon or instrument" or by means of "force likely to produce great bodily injury."[17] The two-part definition has not produced a case law test significantly different from that used by the federal courts. ▮ "A 'deadly weapon' within the meaning of Penal Code section 245, subdivision (a) is any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury. In determining whether an object not inherently deadly or dangerous acquires this characteristic, the trier of fact may look to the nature of the weapon, the manner of its use, and all other factors that are relevant to this issue." (*In re Jose R.* (1982) 137 Cal.App.3d 269, 275-276 [186 Cal.Rptr. 898]; see also cases cited *id.*, at p. 276, fn. 3.)

▮ Thus, both the federal and state law definitions consider some weapons or objects to be inherently deadly or dangerous, take into account the totality of relevant circumstances in assessing the potential injury from the use of any object and require, at a minimum, that the object (together with its manner of use under all the circumstances) creates the potential for great bodily harm or injury. There is no substantial difference, if any at all. Leever confuses the federal statute's *intent* requirement (to do bodily harm—arguably *any* bodily harm) with its more stringent requirement for the weapon or object's potential harm. Then, he mistakenly views subsection (f) of the same federal statute (18 U.S.C. § 113) as a provision intended

---

[17]Section 245, subdivision (a)(1), currently reads as follows:

"Every person who commits an assault upon the person of another with a *deadly weapon or instrument* other than a firearm or by any means of *force likely to produce great bodily injury* is punishable by imprisonment in the state prison for two, three or four years, or in a county jail not exceeding one year, or by fine not exceeding ten thousand dollars ($10,000), or by both such fine and imprisonment." (Italics added.)

for serious assaults—those resulting in actual "serious bodily injury"—and concludes that subsection (c) therefore must define a less serious assault than subsection (f). However, a comparison of the two subsections shows that they do not (despite disparity in punishment) define different degrees of the same offense but instead offenses fundamentally different in their requirements for intent, harm and the instrumentality used. Subsection (f) defines a general intent crime in which serious injury must actually result and no particular instrumentality is specified, while subsection (c) defines a specific intent crime in which no actual harm need occur and the type of instrumentality is specified.[18] (See *United States* v. *Big Crow* (8th Cir. 1984) 728 F.2d 974, 975; *United States* v. *Webster* (7th Cir. 1980) 620 F.2d 640, 641-642 [55 A.L.R.Fed. 890]; *United States* v. *Knife* (8th Cir. 1979) 592 F.2d 472, 482.) We note, incidentally, that California's section 245, like subsection (c) of the federal statute, does not require that actual harm result. (*People* v. *Wingo, supra,* 14 Cal.3d 169, 176; *People* v. *Yeats* (1977) 66 Cal.App.3d 874, 878 [136 Cal.Rptr. 243].)

We hold that there is the necessary congruence of elements between the state and federal assault statutes to support the one-year enhancement under section 667.5, subdivision (b).

DISPOSITION

The judgment of conviction must be affirmed. The judgment of sentence, however, cannot stand insofar as it imposes two, consecutive five-year enhancements for serious felonies under section 667 and reflects a stayed section 667.5, subdivision (b), enhancement for the federal bank robbery prior. Rather than simply strike the invalid enhancements ourselves and affirm as Leever suggests, however, we find that it is appropriate to remand the case for resentencing consistent with our reasoning in *People* v. *Burns* (1984) 158 Cal.App.3d 1178, at pages 1183 to 1184 [205 Cal.Rptr. 356]. (See also *People* v. *Savala* (1983) 147 Cal.App.3d 63, 66-70 [195 Cal.Rptr. 193].) The invalid enhancements have yielded a drastic reduction in the aggregate imposed sentence, from 13 to 3 years; the trial court has not imposed the maximum sentence allowed by law for the robbery (§ 213 [five years]); the existence of the prior felonies, while not sufficient to establish the invalid enhancements, is a factor which may be considered in selecting the appropriate term for robbery (Cal. Rules of Court, rules 421(b)(3), 439 and 441(b)); the invalidity of the section 667 enhancement for the prior felony

---

[18]Subsection (f) of section 113 (18 U.S.C.) punishes "[a]ssault resulting in serious bodily injury, by fine of not more than $10,000 or imprisonment for not more than ten years, or both." Subsection (c) punishes "[a]ssault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by fine of not more than $1,000 or imprisonment for not more than five years, or both."

assault now leaves no double-punishment basis for staying the section 667.5, subdivision (b), enhancement term for that offense (§ 654); and there is no danger that resentencing will result in an aggregate term exceeding the one originally imposed.[19]

Accordingly, the judgment of conviction is affirmed, and the case is remanded with directions to strike the three invalid enhancements and to resentence appellant in a manner consistent with the views expressed in this opinion.

The petition for writ of habeas corpus is denied effective upon the finality of our decision on the appeal herein (see Cal. Rules of Court, rule 24(a)).

Rouse, J., concurred.

**KLINE, P. J.,** Concurring.—For me the closest question in this case is whether, when he received the letter from the certified law clerk working in the prisoner service division of the sheriff's office, Judge Stern should have reconsidered his prior grant of Leever's *Faretta* motion and held a hearing on the issue of Leever's competency to waive counsel. In my view, that letter provides indicia of Leever's incompetence to waive counsel and conduct his own defense which, if it were standing alone, would require further judicial inquiry into the issue.

The letter did not stand alone, however, and it is for this reason that I concur in the judgment.

First, prior to the time the letter was submitted to him, Judge Stern had conducted a substantial inquiry into Leever's mental competency with the assistance of, among others, a physician, Dr. David Kessler, and a psychologist, Dr. Linda Carson, who under appointment examined Leever and reported to the trial court.

Second, during the several court proceedings prior to the court's receipt of the letter, Deputy Public Defender Michael N. Burt, who was then representing Leever, and who was familiar with the psychiatric reports submitted to the court, including that of Dr. Nievod,[1] never indicated a belief Leever lacked the competence to waive counsel.

---

[19]There is, under these circumstances, no merit to Leever's contention that the trial court, having once exercised its discretion and imposed the middle, three-year term for robbery, has no jurisdiction to impose the aggravated, five-year term upon resentencing, even if otherwise appropriate. (*In re Ditsch* (1984) 162 Cal.App.3d 578, 581-582 [209 Cal.Rptr. 12], relying on *People* v. *Burns, supra,* 158 Cal.App.3d 1178, 1184.)

[1]The reports of Dr. Kessler dated November 2, 1982 and from Dr. Carson dated November 4, 1982, both adverted to Dr. Nievod's evaluation of Leever.

Third, in vigorously pursuing his right to waive counsel and proceed in propria persona, Leever himself implicitly asserted his competence to do so and, in fact, by his behavior and the nature and quality of his oral presentation, demonstrated that he "was literate, competent and understanding, and that he was voluntarily exercising his informed free will." (*Faretta* v. *California* (1975) 422 U.S. 806, 835 [45 L.Ed.2d 562, 582, 95 S.Ct. 2525].)

In short, Judge Stern's failure to reconsider the question of Leever's competence to waive counsel is primarily justified by the depth of his earlier inquiry into Leever's competence to stand trial. Even indulging the assumption that an inquiry into a defendant's competence to stand trial can be distinguished from an inquiry into his competence to waive counsel (see *People* v. *Wolozon* (1982) 138 Cal.App.3d 456 [188 Cal.Rptr. 35]; Felthous, *Competency to Waive Counsel: A Step Beyond Competency to Stand Trial* (1979) 7 J. Psychiatry & L. 471), both inquiries obviously focus upon the defendant's ability to act rationally in connection with his own defense. This is a matter that had been more than adequately investigated by Judge Stern prior to the time he received the PSD letter. It bears mentioning, as well, that the PSD letter did not identify any evidence of Leever's mental competence not previously available to and therefore presumably considered by the court.

Finally, the transcript of the trial before Judge Dossee confirms the judgment that Leever was competent to dispense with counsel and represent himself. Without citing specific examples, with which the transcript is replete, suffice it to note that Leever advanced a tenable defense theory, made intelligent tactical decisions, indicated familiarity with the rules of evidence and pertinent constitutional principles, conducted articulate and reasonably effective direct and cross-examination of witnesses, and, insofar as a cold record permits one to judge, tried his case skillfully. The fact that the jury rejected his theory shows only that the jury believed the evidence showed guilt. The trial record does not indicate defendant was mentally incompetent to waive counsel and conduct his own defense; indeed, it shows he was competent to do so.