[No. H013910. Sixth Dist. Oct. 29, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH ANTHONY WASHINGTON, Defendant and Appellant.

[No. H014963. Sixth Dist. Oct. 29, 1996.]

In re KENNETH ANTHONY WASHINGTON on Habeas Corpus.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III., V. and VI. of the majority opinion and the concurring and dissenting opinion.

COUNSEL

Michael A. Willemsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WUNDERLICH, J.—**

### I. *Statement of the Case*

Defendant Kenneth Anthony Washington appeals from a judgment entered after a jury found him guilty of two counts of first degree burglary. The jury also found true allegations that defendant had nine prior convictions that qualified as "strikes" under Penal Code section 667, subdivisions (b) through (i), popularly known as the "three strikes" law.[1]

On appeal, defendant claims the court gave erroneous instructions on aiding and abetting. He also claims the court erred in (1) permitting the jury to convict him of two burglaries, (2) imposing separate punishment for both burglary convictions, (3) failing to exercise discretion to impose concurrent sentences on the burglaries, (4) imposing five-year enhancements consecutive to the two burglary terms, and (5) refusing to exercise discretion to consider whether to dismiss his prior convictions in the interest of justice. Defendant further claims his prior convictions do not qualify as strikes under the three strikes law and that the law itself was not properly enacted as an urgency measure. Finally, defendant claims his attorney rendered ineffective assistance, in that he elicited defendant's drug use, did not move for acquittal on one burglary count, failed to subpoena a witness, and failed to object to a note written by a witness, evidence of his poverty, and evidence of an arrest for a domestic disturbance.

We reverse one burglary conviction, vacate the judgment, and remand the matter for further proceedings.

Defendant also filed a petition for a writ of habeas corpus, which we have considered with his appeal. In it he asserts a claim of ineffective assistance identical to that raised in his appeal. We deny the petition.

### II. *Facts*

At 7:15 a.m. on April 15, 1994, Mildred Bradke was walking her dog in the park next to an apartment complex on Weddell Drive in Sunnyvale. She

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

saw two people removing the window screen from apartment 26. One of them, a slender, light-skinned Black person, wearing a red bandanna, entered through the window. Bradke shouted to the man who remained outside. The man identified himself as "Newsome" and said he lived in the apartment and his wife had to go through the window because they had locked themselves out. Thereafter, the man entered through the door.

Bradke knew that Linda Auble lived in apartment 26 and a Black woman named Newsome lived in apartment 24. She confirmed this by checking the building's directory. She then left a note in the manager's mailbox, reporting what she had seen and describing the man as a "heavy Black man" and the other person as a "slim person in green slacks."[2]

The apartment manager Luis Villasenor found the note and at 8:30 a.m. checked apartment 26. The screen was in place, and nothing seemed wrong. He attempted without success to call Auble. Later, at 9:30 a.m., Villasenor was making service calls and writing in a book, when defendant approached from a nearby car, tried to see what Villasenor was writing, and said he was interested in renting an apartment. A second Black person was in the car.

Villasenor showed defendant apartment 29, which was vacant, and then started back to his office. Remembering Bradke's note, Villasenor instead went to apartment 26. Defendant was standing outside the window while someone else entered. The screen was off. Defendant said "manager" and "stay still." Villasenor asked who had gone through the window, but defendant denied knowing anything about it and said he was visiting someone in apartment 24. Villasenor went to the assistant manager's apartment and asked her to call 911. He heard defendant knock on apartment 26 and say, "Let's get out of here, they are calling the cops." A tall thin woman with a red bandanna ran out, and she and defendant ran to a nearby car. Villasenor followed. Defendant removed the rear license plate, and then he, the woman, and a third person sped away.

Villasenor entered Auble's apartment and called the police. Officer Robert Mongrain of the San Jose Police Department arrived. He found no usable fingerprints inside the apartment. Villasenor took Mongrain to his office to get Auble's phone number. There, a man called, asked if the police were there, and wanted Auble's phone number. Villasenor recognized defendant's voice and gave the phone to Mongrain. The caller said he and Auble were

---

[2]At trial, Bradke was unable to identify defendant from a photo layout. She later testified that one of the photos was similar to defendant. She also testified that defendant was similar to the man who entered the apartment. She later told Detective Mark B. Sole that she could not identify defendant as the man she saw and said she did not believe he was the man.

friends and could "straighten this all out." When Mongrain asked the caller to come there, the caller declined, saying he had two felonies and this would be a third strike. The man called back later and got Auble's phone number.

Villasenor and Mongrain went to apartment 24 because Villasenor said defendant was the occupant's, Helena Newsome's, boyfriend. The door was unlocked. The screen was on the window. From there, they went to Auble's apartment. The previous caller phoned there but said he would call back later.

When Auble arrived, she said a cordless phone, a clock radio, and $8 in change were missing. When she left that morning the screen was on the window. Villasenor described to her the man he had seen. Auble said it was defendant, Newsome's boyfriend. Auble had seen him for a few months but had never given him permission to enter her apartment. While Mongrain was still at the apartment, the man who had called earlier called and said something to the effect that he would not do that to her. Auble became upset and hung up. He called again and identified himself to Mongrain as defendant. He denied taking part in the incident and blamed two other "guys" he met in East Palo Alto but did not know. He said he would find out and tell his parole officer.

At trial, Helena Newsome testified that she met defendant in October 1993 and had written to him while he was in Folsom prison. After his release, they became romantically involved and were presently engaged. On April 15, 1994, he was in the process of moving into her apartment. However, she had not seen him for a week because they had had an argument. She testified that defendant had been with a woman named Vicky, who was skinny and wore a bandanna. Newsome said defendant was unemployed but she gave him "living money" and "gas money" and let him use her car. She said he did not have a key to her apartment on April 15 but had permission to enter through the window if necessary.

Two weeks after the burglary, police responded to a neighbor's report of a domestic disturbance at Vicky Bell's home and arrested defendant. Police learned there was a parole hold on defendant stemming from the burglary. According to Officer Mark Sole, defendant said he paid a man named Jack to drive him and Vicky Bell from East Palo Alto to Newsome's apartment so he could take a shower. While Jack stayed in the car, he and Bell broke into Newsome's apartment, with permission. Defendant said that when he finished showering, Bell was gone. He heard a commotion at apartment 26. He went outside and because he was on parole told Bell to get out of that apartment. She did, and they walked to the car where Jack was waiting. He

bent the rear license plate so it could not be read. Bell had a telephone and a clock radio.

## The Defense

Defendant testified and repeated what he told Officer Sole but added more detail. He said he had to shower at Newsome's because he had a job interview at Great America. When he, Jack, and Bell arrived at Newsome's apartment, Jack waited in his car. Defendant said he told a woman with a dog that he lived in the apartment and explained that his girlfriend was going in to open the door because he had left the keys inside. After entering, Bell left to get cigarettes. When she returned, defendant went outside and asked Jack to wait a bit longer because he was waiting for a call from Great America. On his way back to the apartment, defendant met Villasenor. He denied trying to see what Villasenor was writing. He asked about renting an apartment because he was not sure his plans with Newsome would work out. He explained that his mother said she would pay his rent. After Villasenor showed him an apartment, defendant returned to Newsome's apartment and made some phone calls. Bell was gone.

Defendant then heard Villasenor yelling to him about someone going into an apartment. Defendant said he did not know who it was but looked in and saw Bell, who motioned for him to be quiet. Instead, he told her to get out because the manager had seen her enter and was now calling the police. He then said, "Let's get out of there." Bell ran out to the car, and he panicked, followed her, and bent Jack's rear license plate so Villasenor could not read it. All three then drove away. He did not see stolen property in the car.

In the car, Bell asked defendant why he was worried. He had not done anything. She said if necessary, she would testify "like I did everything." Defendant asked her to go immediately with him and tell his parole officer. They brought defendant to his mother's house, where he phoned his parole agent, Mr. Watkins. He said someone had burglarized an apartment and he would not say who unless "push came to shove."

Defendant said that he later called Villasenor to get Auble's number to tell her about the burglary. He had Bell call Auble and say it was defendant's sister. Auble yelled and hung up on her. Defendant called back and tried to explain that he would never have burglarized her home. She said she wanted her property back, and he said he would pay for it, begged her not to press charges, and said he would be in prison for life if she did. She hung up. He said he later identified Jack and Bell to Officer Mongrain.

Defendant explained that when he spoke to Officer Sole, he identified Jack and Bell but did not tell him everything because he has learned that

saying too much "comes back on you like it's doing on me now." He said he had asked and Bell agreed to turn herself in.

Defendant admitted he fled because he did not want to be arrested and that he lied to Officer Mongrain when he told him about "two guys" whom he did not know. He said he protected Bell because they were close.

### III. *Retrospective Application of Montoya**

. . . . . . . . . . . . . . . . . . . . . . . . .

### IV. *Multiple Convictions*

 As noted above, defendant was convicted of two burglaries, and the court imposed separate terms for each one. Defendant contends that as a matter of law he could only be convicted of one burglary. Alternatively, he claims that the court erred in failing to instruct on the issue of whether his conduct constituted one or two burglaries.

According to defendant the evidence showed that after the first entry into Auble's apartment, he and Bell "remained in the vicinity of the apartment, with both (or [Bell], at least) waiting for the opportunity to complete the plan." Defendant argues that these facts, in turn, establish as a matter of law that the two entries into Auble's apartment were part of a single intention, impulse, and plan to burglarize it. Under these circumstances, he claims he could only be convicted of one burglary. In support of this claim, defendant relies primarily on *People* v. *Bailey* (1961) 55 Cal.2d 514 [11 Cal.Rptr. 543, 360 P.2d 39].[8]

 In *Bailey,* the defendant was convicted of grand theft based on evidence she unlawfully received numerous welfare checks each less than $200 but aggregating to more that amount.[9] (55 Cal.2d at pp. 515, 518.) In dicta, the court discussed whether the defendant was guilty of grand theft or a series of petty thefts. The trial court had instructed the jury that if several thefts are done pursuant to an initial design to take more than $200 and more than that amount is taken, there is one crime of grand theft. However, if

---

*See footnote, *ante,* page 568.

[8]Our reversal of the second burglary conviction does not render this claim moot, for the issue raised affects whether the reversed count may be retried.

Reversal of one count does, however, render it unnecessary to address defendant's related claim that even if he could be convicted of two burglaries, section 654 prohibited separately punishing both.

[9]At the time, grand theft involved, among other things, theft of money exceeding $200. (See former § 487.)

there is no such initial design, then the taking of less than $200 is petty theft. (*Id.* at pp. 518-520; see CALJIC No. 14.31.) In approving this instruction, the court noted that in theft-by-false-pretense cases, the separate receipt of various amounts of money as part of "a single plan" "may be cumulated to constitute but one offense of grand theft." (55 Cal.2d at p. 518.) In those cases, as well as in larceny and embezzlement cases, the applicable test is "whether the evidence discloses one general intent or separate and distinct intents." (*Id.* at p. 519.) The court then opined, "[w]hether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Ibid.*)

The single-intent-and-plan doctrine or test articulated in *Bailey* has been consistently applied in *theft* cases. (See, e.g., *People* v. *Sullivan* (1978) 80 Cal.App.3d 16 [145 Cal.Rptr. 313] [error not to give *Bailey* instruction where evidence supports finding one intent and plan concerning multiple misappropriations]; *People* v. *Packard* (1982) 131 Cal.App.3d 622 [182 Cal.Rptr. 576] [affirming one count of grand theft and reversing others where no evidence of separate intents and plans]; *People* v. *Kronemyer* (1987) 189 Cal.App.3d 314 [234 Cal.Rptr. 442] [following *Packard*]; see also 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Property, §§ 572-573, pp. 649-651.)

In *In re William S.* (1989) 208 Cal.App.3d 313 [256 Cal.Rptr. 64], however, the court declined to apply it in a multiple-entry burglary case. There, as here, the evidence revealed two entries into the same residence hours apart. The court explained that the *Bailey* test was developed for theft cases. "Although thefts were involved here, to be sure, burglary is a considerably different offense. The gist of burglary is the entry into a structure with felonious intent. Technically at least, a new burglary occurs with every new entry." (*Id.* at p. 317; Cf. also *People* v. *Neder* (1971) 16 Cal.App.3d 846 [94 Cal.Rptr. 364] [*Bailey* inapplicable to multiple forgeries].)

Although it rejected the *Bailey* test, the court nevertheless felt obligated to fashion a special test for multiple-entry burglary cases. The court reasoned that under certain circumstances, allowing separate convictions for every entry could produce "absurd results." (*In re William S., supra,* 208 Cal.App.3d at p. 317.) For example, where "a thief reaches into a window twice attempting, unsuccessfully, to steal the same potted geranium, he could potentially be convicted of two separate counts." (*Ibid.*) To avoid such results, the court analogized burglary to sex crimes, "where a different

multiple entry question poses similar puzzling problems for judges and juries[,]" (*ibid.*) and adopted the test formulated in *People* v. *Hammon* (1987) 191 Cal.App.3d 1084, 1099 [236 Cal.Rptr. 822], to determine whether one or more sex crimes have been committed. Quoting *Hammon*, the court stated, " '[W]hen there is a pause . . . sufficient to give defendant a reasonable opportunity to reflect upon his conduct, and the [action by defendant] is nevertheless renewed, a new and separate crime is committed.' " (*In re William S.*, *supra*, 208 Cal.App.3d at p. 317.)

As both parties correctly note, the legal basis for this new test disappeared when the court in *People* v. *Harrison* (1989) 48 Cal.3d 321 [256 Cal.Rptr. 401, 768 P.2d 1078] disapproved *Hammon*. (*Id.* at pp. 332-334.) In *Harrison*, the defendant claimed his seriatim digital penetrations of the same victim during a continuous assault constituted a single offense. In rejecting this claim, the court explained that given the history and language of the applicable statute (§ 289), a new and separate offense is completed with each new and separate penetration, however slight. (48 Cal.3d at p. 329.) In disapproving *Hammon*, the court faulted it for focusing on perceived sentencing disparities arising from multiple convictions instead of analyzing "the sufficiency of the evidence in terms of the particular statutory violations at issue." (*Id.* at p. 332.) The court also faulted *Hammon* for adding totally irrelevant factors to the statutory definition of the offense. (*Ibid.*)

We agree with the parties that *Harrison* casts substantial doubt over *William S.* and use of the *Hammon* test in multiple-entry burglary cases because it would, in effect, add to the statutory definition of burglary.

Defendant argues that we must nevertheless fill the vacuum created by the loss of the *William S.* test and urges us to adopt a test based on *Bailey*: if multiple entries are made pursuant to one intention, one general impulse, and one plan, then there can be only one conviction for burglary. We decline to do so.

As noted above, the court in *William S.*, rejected use of the *Bailey* rule because of the essential difference between theft and burglary. In *People* v. *Neder*, *supra*, 16 Cal.App.3d 846, the court found *Bailey* inapplicable to multiple forgery convictions. The court acknowledged that the multiple forgeries were probably motivated by a single intent to obtain property from the same victim. Nevertheless the court distinguished forgery from theft. It noted that the essence of theft is a taking. Thus, "[i]f a certain amount of money or property has been taken pursuant to one plan, it is most reasonable to consider the whole plan rather than to differentiate each component

part."[10] (*Id.* at p. 852.) Forgery, on the other hand, "is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud." (*Id.* at pp. 852-853.) The court opined that while "[t]heft pursuant to a plan can be viewed as a large total taking accomplished by smaller takings[,] [i]t is difficult to apply an analogous concept to forgery. The designation of a series of forgeries as one forgery would be a confusing fiction." (*Id.* at p. 853, fn. omitted.)

■ We believe the difference between theft and burglary makes application of the *Bailey* rule inappropriate. We also find the *Neder*'s analysis apropos. Although in many cases the goal of a burglary is theft, burglary occurs regardless of whether a theft is accomplished or even attempted. More importantly, the conduct described and proscribed by section 459 is a single act: entry. Designating a series of separate and factually distinct entries as one single entry is no less an unreasonable fiction than designating a series of forgeries one forgery or a series of penetrations a single rape.

The *Bailey* rule also appears too broad. Under it, a person who planned to steal everything in a residence by unlawfully entering it once every day for a week until all the contents are taken could be convicted of only one burglary regardless of how many unlawful entries he or she made. Such a result, however, disregards the number of culpable acts committed by such a perpetrator. It also ignores that the proscription against residential burglary is designed not so much to deter trespass and the intended crime but to prevent risk of physical harm to others that arises upon the unauthorized entry itself.[11] (See *People* v. *Gauze* (1975) 15 Cal.3d 709, 714 [125 Cal.Rptr. 773, 542 P.2d 1365].)

We acknowledge dicta in *People* v. *Montoya* (1994) 7 Cal.4th 1027 [31 Cal.Rptr.2d 128, 874 P.2d 903], where the court stated, "In the present case, defendants were charged with and convicted of a single burglary, and the evidence demonstrates that the multiple entries were 'committed pursuant to one intention, one general impulse, and one plan.' (*People* v. *Bailey*[, *supra*,]

---

[10]Witkin makes the same point, explaining the theory behind the *Bailey* test is that "the defendant obtained possession of the desired money or property by unlawful means, and his guilt was determined by that fact and not by the methods employed." (2 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against Property, § 573, p. 650.)

[11]Although the risk of harm to others may appear to be less when a person makes multiple entries within shorter periods of time, we do not believe the risk necessarily disappears or ceases to be a reason against adopting the *Bailey* rule. For example, residents who hear someone enter may hide and upon hearing the person exit leave their place of hiding only to encounter the intruder as he or she reenters to obtain more loot.

55 Cal.2d [at p. 519] . . . ; see *In re William S., supra*, 208 Cal.App.3d [at pp. 316-318].) Accordingly, we need not concern ourselves with whether multiple burglaries properly could have been alleged or proved. (Cf. *In re William S., supra*, 208 Cal.App.3d [at pp. 315-318] [upholding separate convictions for second entry into burglarized residence several hours after first entry]; *People v. Harrison*[, *supra*, ] 48 Cal.3d [at pp. 327-334] . . . [separate convictions for consecutive sexual penetrations with foreign object upheld] . . . ." (*People v. Montoya, supra*, 7 Cal.4th at p. 1046, fn. 10.)

This dicta does not suggest that the court considers the *Bailey* rule applicable in multiple-entry burglary cases. This is especially so given the court's citation to *Harrison*, where, as noted above, it concluded that each penetration during the course of a continuous sexual assault can support a separate conviction. At most, the court considers the issue an open question. We conclude that the *Bailey* rule is inappropriate and inapplicable.

Moreover we do not believe the theoretical possibility of multiple convictions in certain extreme hypothetical fact situations, like that posed in *William S.* involving the unsuccessful geranium thief, requires creation of a special rule to prevent what may appear to be absurd results. In this regard, we agree with the People that concern about absurd results is better resolved under section 654, which limits the punishment for separate offenses committed during a single transaction, than by a rule that, in effect, creates the new crime of continuous burglary. Consequently, we follow the underlying reasoning of the court in *William S.*: Since burglary is analogous to crimes of sexual penetration, it is appropriate to apply the same analysis.[12] The applicable analysis is found in *Harrison*.

As noted above, the court in *Harrison* concluded that since crimes of sexual penetration are complete upon penetration, however slight, multiple penetrations supported multiple convictions. We point out that the court's analysis was not based on the sexual *nature* of the offenses or the fact that the offenses involved physical acts against people. Rather, the analysis was dictated solely by the statutory language and the temporal threshold for establishing guilt, i.e., when the offense is complete for purposes of prosecution. (*People v. Harrison, supra*, 48 Cal.3d at pp. 327-329.) Thus, we do not find the *Harrison*'s analysis inherently limited to sexual offenses and consider it proper and appropriate to apply it here.

Under section 459, burglary consists of an unlawful entry with the intent to commit a felony. Thus, the crime is *complete*, i.e., one may be prosecuted

---

[12]In *Montoya*, the court also observed that the invasive act comprising a burglary may be analogized to sexual offenses which have a similar element of unwanted personal invasion. (7 Cal.4th at p. 1045.)

and held liable for burglary, upon entry with the requisite intent. (*People* v. *Montoya*, *supra*, 7 Cal.4th at pp. 1041-1042.) It follows, therefore, that every entry with the requisite intent supports a separate conviction.

Given our discussion, we conclude that defendant was properly charged and could properly have been convicted of two burglaries. [13]

### V., VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### VII. *Disposition*

Defendant's conviction on count 2 (the second burglary) is reversed. The remaining conviction is affirmed. However, the judgment is vacated, and the matter remanded for further proceedings, including resentencing.

The petition for a writ of habeas corpus is denied, the denial to become effective upon the finality of our decision on defendant's appeal. (See Cal. Rules of Court, rule 24(a); cf. *People* v. *Leever* (1985) 173 Cal.App.3d 853, 881 [219 Cal.Rptr. 581].)

Cottle, P. J., concurred.

**BAMATTRE-MANOUKIAN, J.,** Concurring and Dissenting.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

Appellant's petition for review by the Supreme Court was denied February 19, 1997. Mosk, J., was of the opinion that the petition should be granted.

---

[13]Given our conclusion, we necessarily reject defendant's claim that the court erred in failing to give the jury appropriate instructions so it could decide whether defendant committed one or two burglaries.

*See footnote, *ante*, page 568.