Filed 5/22/25  P. v. Frenette CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JONATHAN WILLIAM FRENETTE,<br><br>    Defendant and Appellant. | D085720<br><br><br><br>(Super. Ct. No. SWF1907792) |


APPEAL from a judgment of the Superior Court of Riverside County, Stephen J. Gallon, Judge.  Reversed in part, affirmed in part, and remanded for resentencing.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General.

Jonathan William Frenette appeals a judgment entered after a jury found him guilty of sexual penetration of a person 10 years of age or younger (Pen. Code, § 288.7, subd. (b); count 1), a lewd and lascivious act upon a child

under the age of 14 years (§ 288(a); count 2), a forcible lewd and lascivious act upon a child under the age of 14 years (§ 288(b)(1); count 3), and attempting to prevent and dissuade a witness from reporting a suspected crime (§ 136.1(b)(1); count 5). The jury also found true allegations Frenette committed counts 2 and 3 during the commission of a first degree burglary (§ 667.61(d)(4)). The court sentenced Frenette to, among other sentences, an indeterminate term of life without the possibility of parole on count 3. Of the three issues Frenette raises on appeal, only the third has any merit.

First, Frenette argues his conviction on count 3 must be reversed because there is no substantial evidence he committed the alleged lewd act by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury, as required to support a conviction of forcible lewd conduct (§ 288(b)(1)). We conclude substantial evidence supports his conviction of forcible lewd conduct in count 3.

Second, Frenette argues substantial evidence does not support the jury's true findings on the allegations he committed two separate burglaries in committing counts 2 and 3 (§ 667.61(d)(4)). We conclude otherwise.

Finally, Frenette argues the matter must be remanded for resentencing because the trial court failed to recognize its discretion to impose a two-year term for count 5 either concurrently or consecutively to the indeterminate life terms. We agree and conclude the record affirmatively shows the court did not understand its discretion to impose either a concurrent or consecutive term for count 5.

We thus reverse in part, affirm in part, and remand for resentencing.

2

I.

A.

In November 2019, J.M. (Father), K.M. (Mother), and their three children—five-year-old Jane Doe, who is autistic, C.M., and their youngest sibling—lived in a three-bedroom home. The two girls, Jane and the youngest sibling, shared a bedroom, and C.M. had his own bedroom. Father and Mother were in divorce proceedings. Father was home on weekends. While Father was away, Mother used babysitters to help care for the children. Beginning in 2018, Frenette was one of the babysitters, and he cared for the children once every week or two. Frenette's son became C.M.'s friend, and accompanied Frenette when he babysat the children.

On or about November 16, Jane told Father during a car ride she did not like the "tickle game." On Father's questioning, Jane stated Frenette had touched her in her private area and she did not like it. When Father asked how Frenette had touched her down there, Jane made a hand motion with her index finger pointing upward. When they returned home, Father and Mother talked to Jane. Jane described how Frenette put his fingers in her vagina and "butt" and held her legs behind her head.

Mother called a couple who lived nearby and had a close relationship with Jane, and asked them to come over and talk with Jane to make sure she was telling the truth. After initially denying Frenette had inappropriately touched her, Jane, in a recorded conversion, talked about his "tickling": "No, I was trying to block it but umm–I was trying to block my butt from [Frenette] and then [Frenette] opened it, and then . . . [Frenette] opened my legs, and then umm he sticked umm—umm—he opened my pants, and then he stick it, and then umm he sticks his hand, and then he opened this, and then umm he tickled my butt, but never—but that didn't happen." During her description

3

of that conduct, Jane demonstrated how Frenette pushed her legs open.  She said she did not like the way it felt when Frenette touched her in her private area.  When she tried to tell Frenette to stop, his pants fell down and she said "oopsie" and saw his "pee-pee" and "butt."  Jane then denied anything happened, but expressed her fear she was going to be in trouble.

After the neighbors described to Mother and Father their conversation with Jane, Mother called 911 and reported the matter.  Jane then told Mother about an incident during which Frenette pulled down her pants and C.M., hearing her cry, entered her bedroom and told Frenette he was going to tell.  Frenette told both of them to never tell or they would never see Frenette's son again.

During a recorded forensic interview, Jane denied anybody had touched her in her private area or that Frenette had touched her.  But Jane also claimed her clothes were up when she "blocked it" with her "song book," and then Frenette "didn't tickle" and stated he would not do it ever again.  She held the book in front of her private area because she did not like Frenette tickling her private, which he did one time when her clothes were on.  Frenette told her to lie to her parents and say he did not touch her private.  She later claimed Frenette never did that, but she did not want him to do that.  She did not want to get into big trouble.

After her initial disclosures to her parents and the forensic interview, Jane talked with her parents about Frenette's touching of her.  In particular, Jane told Mother she did not touch Frenette's penis because she had washed her hands.  She stated it started as a game of "you can touch mine before I touch yours."  She would be sleeping and he would wake her up and "pee" on her bed or "mess[ ] on" it.  She hid under her bed after Mother left the house because she was afraid Frenette was going to touch her again.  Jane also

4

claimed she used a plastic book to try to block Frenette from touching her, but he used his muscles and moved it.

After November 16, Jane also told the neighbor about incidents during which Frenette touched her. Jane told her Frenette had "peed" on her bed and it was white. Jane said she placed some kind of music box in front of her private part to block anything from happening when Frenette was there. She described one incident when the boys were in C.M.'s bedroom and she was lying on the floor in her bedroom. After Frenette removed her underwear, C.M. walked in and then walked out.

On November 25, Gerald Franchville, an investigator with the Riverside County Sheriff's Department, went to the family home to retrieve a soiled purple blanket Jane had previously described. Jane walked Franchville to her bedroom and identified the blanket Frenette had "peed" on. She also told him Frenette had "peed" on a wall. Jane described where Frenette had touched her and pointed toward her crotch area. Jane relayed one incident where Frenette stated he was going to pull down his pants, he did so, and then C.M. walked into the bedroom. C.M. was upset and told Frenette to stop and that his parents were coming home. Frenette told Jane not to tell Mother, but she eventually did.

In a forensic interview, C.M. described an incident when Frenette sent Frenette's son and him to his bedroom and told them they could play quietly. C.M. heard a sound like Jane crying and went to her bedroom. When he opened her door, he saw Frenette pulling Jane's pants down to her shoes while her underwear was still up. C.M. told Frenette to stop, he did, and Jane then pulled up her clothes. He did not tell his parents about that incident initially because Frenette told him not to or he would never see Frenette's son again.

5

## B.

An amended information charged Frenette with the four counts listed above, along with an additional charge of attempting to prevent and dissuade a witness from reporting a suspected crime (§ 136.1(b)(1); count 4).

## C.

At Frenette's jury trial, the prosecution presented the testimony and other evidence discussed above, along with recordings and transcripts of Jane's statements to the neighbors, her forensic interview, her interview with Franchville, and C.M.'s forensic interview. Jane testified (1) she did not think Frenette touched her inappropriately or (2) she did not remember it. She later admitted, however, she was scared of Frenette because he had touched her down there. She testified Frenette touched both the parts where she goes "pee-pee" and "poo-poo" one time, and the following morning she felt ticklish. Jane told her parents the whole story. After Frenette told the children to go to bed, he came in her bedroom, pulled down her pants, stuck his hands in there, and pulled her pants back up. She denied seeing his pants come down and denied Frenette told her not to say anything about the touching.

C.M. testified consistently with his forensic interview.

Franchville testified a search of Frenette's television searches showed terms like "sexy teen girls work out" and "young girls." Forensic reports showed his cell phone was used to search topics like "[s]kinny girls getting raped," "15-year-old sexy girls," and "hot sexy teens." Frenette's laptop was used to visit webpages, such as "sexygirlspicks.com" and "young[-bodies.]net," and included images of girls who appeared to be between 14 and 20 years old in various stages of undress. His laptop included a video of a young girl of similar age and appearance as Jane. In that video, the girl's legs were stuck

in a corn-hole game and she repeatedly opened her legs to show her underwear.

The prosecution also presented the testimony of a clinical and forensic psychologist, who described child sexual abuse accommodation syndrome. That syndrome explains why children who are sexually abused by a person with whom they have an ongoing relationship or care about do not report their abuse right away. In most cases, those abused children recant or retract their initial, albeit delayed, disclosures of abuse.

Frenette testified in his defense. He stated Mother started making verbal advances, flirting, and showing interest in him during 2018 to 2019. He was not interested in her. He once suggested to her if she gave him oral sex and made him ejaculate in less than five minutes, then he would have sex with her. She agreed and did so. However, he felt guilty and left without fulfilling his side of the bargain. Thereafter, things were awkward between them.

Frenette admitted he searched the terms found on his computer and that he had a porn addiction. However, he did not have an unusual interest in prepubescent children. He denied doing anything wrong with Jane. He had tried to fill the void left by Father. He denied C.M. had walked in on Jane and him. However, Jane saw his butt one time when he was taking a shower. He grabbed a towel quickly and Jane laughed and ran away.

According to Frenette, Jane was difficult and would scream, lie on the floor, and kick the door. When Mother could not control Jane's tantrums, Mother would call him to talk to Jane to calm her down. Once, he placed his arm around Jane and she got super mad. About one week before November 16, 2019, he pinched Jane's knee on a pressure point while they were watching a movie. She got angry, elbowed him, and stated it hurt. Frenette

admitted he might have told C.M. he would never see his son again as a punishment tactic.

D.

The jury found Frenette guilty of counts 1, 2, 3, and 5 and not guilty of count 4.  The jury also found true the allegations related to counts 2 and 3.  The court sentenced Frenette to an indeterminate term of life in prison without the possibility of parole on count 3, a concurrent term of 15 years to life on count 1, and a concurrent term of 25 years to life on count 2, all of which were to be served consecutively to a two-year term for count 5.

II.

We address each of Frenette's three appellate arguments in turn.

A.

Frenette first argues there was insufficient evidence to support a finding on count 3 he committed a lewd act on Jane "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury," as section 288(b)(1) requires.  We disagree.

1.

In assessing a claim of insufficient evidence, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 [cleaned up].)  "'[T]estimony of a single witness is sufficient to support a conviction.'" (*People v. Mejia* (2007) 155 Cal.App.4th 86, 93.)  We do not reweigh evidence or reevaluate a witness' credibility, and we presume every reasonable inference in favor of the judgment.  (*Houston*, at p. 1215.)  If the circumstances reasonably justify the jury's findings, the judgment must

8

be affirmed, even if the circumstances might also reasonably support a contrary finding. (*Ibid*.) Given our limited role on appeal, an appellant challenging the sufficiency of the evidence "bears an enormous burden." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

2.

Section 288(a) makes it a felony for any person to "willfully and lewdly commit[ ] any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." Section 288(b)(1) increases the penalty for the felony if the person "commits an act described in subdivision (a) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."

In the context of section 288(b)(1), "force" means "the prohibited act is facilitated by the defendant's use of physical violence, compulsion or constraint against the victim other than, or in addition to, the physical contact which is inherent in the prohibited act." (*People v. Garcia* (2016) 247 Cal.App.4th 1013, 1024 [cleaned up].) In other words, the force must not be "'merely incidental to the act.'" (*Ibid*.) The force used must be substantially different from, or substantially greater than, that necessary to accomplish the lewd act itself. (*People v. Soto* (2011) 51 Cal.4th 229, 242.) "'[A]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves' are sufficient to support a finding that the lewd act was committed by means of force." (*Garcia*, at p. 1024.)

A jury may consider evidence showing the defendant overcame the victim's resistance in determining whether the defendant used force. (*People v. Babcock* (1993) 14 Cal.App.4th 383, 387.) For example, a defendant's

9

grabbing of the victim's hands and overcoming the victim's resistance may be considered a forcible lewd act. (*Id*. at p. 388.) Similarly, a finding of force may be supported by evidence showing that although the victim pushed the defendant away and made him stop, he immediately tried again and again. (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 393.)

Frenette argues there is insufficient evidence to support a finding he used force under section 288(b)(1) to commit a lewd act against Jane as alleged in count 3. He argues the evidence showed his actions were not substantially different from, or substantially greater than, that necessary to accomplish the lewd act itself. (*Soto*, 51 Cal.4th at p. 242.) We disagree.

The evidence discussed above supports a finding Frenette's conduct in committing the lewd act was substantially different from, or substantially greater than, that necessary to accomplish the act, instead facilitating it. (*Soto*, 51 Cal.4th at p. 242; *Garcia*, 247 Cal.App.4th at p. 1024.) In her initial disclosures to Mother and Father, Jane described how Frenette put his fingers in her vagina and "butt" while holding her legs behind her head. The jury could reasonably find Frenette's holding of her legs behind her head while he touched her vagina was not merely incidental to the lewd touching, but instead facilitated that lewd touching. (*Garcia*, at p. 1024.)

Also, Jane described to the neighbors how she tried to block her "butt" from Frenette, but he opened her legs and pants and then used his hand to tickle her "butt." She demonstrated for them how Frenette pushed her legs open. The jury could reasonably find Frenette's opening of Jane's legs when she tried to block him from touching her vagina was not merely incidental to the lewd touching, but instead facilitated that lewd touching. (*Garcia*, 247 Cal.App.4th at p. 1024.)

And, during her forensic interview, Jane described how she blocked Frenette with her "song book," which she held in front of her private area because she did not like Frenette tickling her private. Jane apparently described the same incident to Mother and the neighbor. The jury could reasonably find Frenette's removal of the book Jane held in front of her private area to block him from touching her there was not merely incidental to the lewd touching, but instead facilitated that touching. (*Garcia,* 247 Cal.App.4th at p. 1024.)

Based on that evidence, we conclude the jury could reasonably find one or more of the above three acts Frenette performed in committing the lewd act against Jane was substantially different from, and substantially greater than, that necessary to accomplish the lewd act. (*Soto*, 51 Cal.4th at p. 242.) The jury could also reasonably find at least one of those acts was not merely incidental to, but instead facilitated, the lewd act and therefore constituted the use of force in accomplishing it under section 288(b)(1). (*Garcia*, 247 Cal.App.4th at p. 1024.)

Frenette argues Jane's statements and trial testimony were inconsistent and ambiguous and therefore do not show he used force in committing the lewd act. However, he ignores Jane's statements discussed above, which indicate he used force. In determining whether substantial evidence supports the jury's finding, we do not reweigh the evidence or reevaluate Jane's credibility, and we presume every reasonable inference in favor of the judgment. (*Houston*, 54 Cal.4th at p. 1215.) The verdict shows the jury credited Jane's statements and trial testimony, as they were entitled to do. Resolution of conflicts and inconsistencies in the evidence is the exclusive province of the trier of fact. (*Mejia*, 155 Cal.App.4th at p. 93.) If the circumstances reasonably justify the jury's findings, the judgment must

11

be affirmed even if the circumstances might also reasonably support a contrary finding. (*Houston*, 54 Cal.4th at p. 1215.) Such is the case here.

We thus conclude substantial evidence supports the jury's finding Frenette committed the forcible lewd act alleged in count 3. Because of this conclusion, we need not address the People's alternative argument substantial evidence supported a finding Frenette used duress instead.

B.

Second, Frenette argues there was insufficient evidence to support true findings by the jury he committed two different burglaries as alleged under section 667.61(d)(4) in committing counts 2 and 3. He argues the evidence showed, at most, he entered Jane's bedroom one time in committing count 2 and it did not support a finding he entered her bedroom in committing count 3. We are not persuaded.

1.

If a person is convicted of committing a section 288(b) offense during the commission of a first degree burglary, the punishment is an indeterminate term of life without the possibility of parole. (§ 667.61(c)(4), (d)(4), & (j)(1).) A burglary offense is completed when a defendant unlawfully enters a building with the intent to commit a felony. (§ 459.) Therefore, "every entry with the requisite intent supports a separate conviction." (*People v. Washington* (1996) 50 Cal.App.4th 568, 579.) Entry with the intent to commit two or more felonies constitutes only one burglary, even though more than one felony is committed after that entry. (*People v. Failla* (1966) 64 Cal.2d 560, 568.) "[A] defendant's entry into a bedroom within a single-family house with the requisite intent [to commit a felony] can support a burglary conviction if that intent was formed only after the defendant's entry into the house." (*People v. Sparks* (2002) 28 Cal.4th 71, 73.)

12

2.

Here, the evidence supports finding Frenette entered Jane's bedroom on two separate occasions in committing counts 2 and 3. Although Frenette argues there was evidence showing he entered her bedroom on only one occasion (i.e., the incident where C.M. walked into her bedroom and saw him pulling down Jane's pants), the record supports a finding he entered her bedroom on at least one other occasion. Jane disclosed to Mother, the neighbors, and Franchville multiple lewd acts committed by Frenette against her. Jane described to them different incidents of touching by Frenette, including where Jane used a book to try to block him, Frenette "peeing" on her bed, Frenette waking her up, Frenette playing a game with her of "you can touch mine before I touch yours," and the time when C.M. entered her bedroom. In determining whether substantial evidence supports the jury's finding, as already mentioned, we do not reweigh the evidence or reevaluate Jane's credibility, and we presume every reasonable inference in favor of the judgment. (*Houston*, 54 Cal.4th at p. 1215.) The verdict shows the jury credited Jane's statements and trial testimony, as they were entitled to do, and on appeal we do not review the jury's resolution of conflicts and inconsistencies in the evidence. (*Mejia*, 155 Cal.App.4th at p. 93.) We thus conclude substantial evidence supported the jury's true findings on the section 667.61(d)(4) allegations related to counts 2 and 3.

C.

Frenette finally argues the trial court did not understand its discretion to impose either a concurrent or consecutive term for count 5 and therefore the matter must be remanded for resentencing. The People argue the record does not affirmatively show the court misunderstood its sentencing discretion. Frenette has the better argument.

## 1.

Section 669(a) provides: "When a person is convicted of two or more crimes . . . , the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively. *Life sentences, whether with or without the possibility of parole, may be imposed to run consecutively with one another, with any term imposed for applicable enhancements, or with any other term of imprisonment.* Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first." (Italics added.) In other words, "[w]henever a person is convicted of two or more crimes, the court must impose either concurrent or consecutive sentences. (§ 669.)" (*People v. Felix* (2000) 22 Cal.4th 651, 655.)

A trial court generally has discretion to impose sentences concurrently or consecutively. (*People v. Bradford* (1976) 17 Cal.3d 8, 20; *People v. Shaw* (2004) 122 Cal.App.4th 453, 458 [§ 669 "grants the trial court broad discretion to impose consecutive sentences when a person is convicted of two or more crimes."].) In particular, "[w]here . . . the trial court imposes an indeterminate life sentence and a determinate sentence, it has discretion to decide whether the sentences shall be served concurrently or consecutively." (*People v. Galvez* (2011) 195 Cal.App.4th 1253, 1264.) Defendants are entitled to "sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court." (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.) "[A] court that is unaware of its discretionary authority cannot exercise its informed discretion." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.)

14

On appeal, a defendant has the burden to "affirmatively demonstrate that the trial court misunderstood its sentencing discretion." (*People v. Davis* (1996) 50 Cal.App.4th 168, 172.) "Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*Brown*, 147 Cal.App.4th at p. 1228.) In contrast, "[i]f the record is silent . . . , the defendant has failed to sustain his burden of proving error." (*People v. Lee* (2017) 16 Cal.App.5th 861, 866.)

2.

In their sentencing memorandum and supplemental memorandum, the People requested, among other things, imposition of the upper three-year term for count 5, "followed by" indeterminate sentences for counts 1, 2, and 3. The People, however, did not state the court was required to impose a consecutive term for count 5 or discuss its discretion to impose either a concurrent or consecutive term for count 5. In Frenette's sentencing brief, amended sentencing brief, and supplemental sentencing brief, he did not discuss sentencing for count 5, much less whether any indeterminate terms imposed for counts 1, 2, and 3 should be served concurrently with, or consecutively to, any determinate term imposed for count 5.

At the sentencing hearing, the court announced the sentences it was imposing for counts 1, 2, 3, and 5. Frenette's counsel then inquired whether its sentences for counts 1, 2, and 5 were to run concurrently with its sentence for count 3. The court replied: "No. Counts 1 and 2 are running concurrent with [count] 3. The determinate [term for count 5] *has to be sentenced consecutively* on that." (Italics added.) Frenette's counsel then stated: "Okay. Thank you."

15

As stated above, in imposing an indeterminate life term and a determinate term, a trial court has discretion to decide whether the life terms shall be served concurrently with, or consecutively to, the determinate term. (*Galvez*, 195 Cal.App.4th at p. 1264; § 669(a) ["[l]ife sentences . . . *may* be imposed to run consecutively . . . with any other term of imprisonment" (italics added)].)  Here, however, the record affirmatively shows the court did not understand it had this discretion.  Specifically, the court stated the two-year term for count 5 "*has* to be sentenced consecutively."  (Italics added.) There is no other reasonable interpretation of the court's statement than that it believed it was *required* to run the three life terms consecutively to the two-year term for count 5.  Contrary to the People's argument, the court's use of the phrase "has to be sentenced consecutively" did *not* simply express a belief a determinate term was warranted for count 5.  Accordingly, on this record we conclude the court did not understand—nor exercise—its discretion to run the indeterminate life terms it imposed for count 1, 2, and 3 either concurrently with, or consecutively to, the determinate term it imposed for count 5. (See, e.g., *Galvez*, at p. 1264; § 669(a).)  It thus abused its discretion.

Because the record shows the court proceeded with sentencing on the erroneous assumption it lacked the discretion to run the indeterminate life terms for counts 1, 2, and 3 either concurrently with, or consecutively to, the determinate two-year term for count 5, we must reverse that part of its sentence and remand the matter for the court to exercise that sentencing discretion at a new sentencing hearing.  (*Brown*, 147 Cal.App.4th at p. 1228.)

III.

We reverse in part, affirm in part, and remand for resentencing.  We reverse the judgment to the extent it ordered the life terms imposed for counts 1, 2, and 3 to run consecutively to the two-year term imposed for

16

count 5.  We affirm the judgment of conviction in all other respects.  We remand with directions to the trial court to conduct a new sentencing hearing at which time it shall exercise its discretion to run the life terms imposed for counts 1, 2, and 3 either concurrently with, or consecutively to, the two-year term imposed for count 5.  Upon resentencing, the trial court is directed to prepare and forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

CASTILLO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.